```
1                  UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2
                                        Civil Action
3                                       No. 10-11233-WGY

4
    * * * * * * * * * * * * * * * * * *
5                                      *
    SHERYL RACHMIL-ETTER and           *
6   GREGG ETTER,                       *
                                       *
7        Plaintiffs,                   *
                                       *  TRANSCRIPT OF
8        v.                            *  THE EVIDENCE
                                       *   (Volume 3)
9   DANIEL C. SNYDER, M.D., and        *
    NEWTON-WELLESLEY ORTHOPEDIC        *
10  ASSOCIATES, INC.,                  *
                                       *
11       Defendants.                   *
    * * * * * * * * * * * * * * * * * *
12

13

14            BEFORE:  The Honorable William G. Young,
                       District Judge, and a Jury
15

16  APPEARANCES:

17            GOROVITZ & BORTEN, P.C. (By Sidney
         Gorovitz, Esq. and Max Borten, Esq.),
18       400 Totten Pond Road, 2nd Floor, Waltham,
         Massachusetts 02451, on behalf of the Plaintiffs
19
              FOSTER & ELDRIDGE, LLP (By Kurt M. Schmidt,
20       Jr., Esq.), One Canal Park, Suite 2100, Cambridge,
         Massachusetts 0214, on behalf of the Defendants
21

22

23
                             1 Courthouse Way
24                           Boston, Massachusetts 02210

25                           June 20, 2013
```

**<u>I N D E X</u>**

**WITNESS:**          **DIRECT   CROSS    REDIRECT   RECROSS**

WILLIAM B. MACAULAY

   By Mr. Gorovitz  5

   By Mr. Schmidt            76

|                                              | **FOR**<br>**I.D.** | **IN**<br>**EVID.** |
|----------------------------------------------|---------|---------|

**EXHIBITS:**

    4     Physicians Technique Brochure  . . . . .27

1          **THE CLERK:**  All rise for the jury.

2          (Whereupon the jury entered the courtroom.)

3          **THE CLERK:**  Court is in session, you may be seated.

4          **THE COURT:**  Well, good morning, ladies and

5   gentlemen.

6          **THE JURY:**  Good morning.

7          **THE COURT:**  Welcome back.  Thanks so much for being

8   on time.  We're all ready to go, and you may proceed,

9   counsel.

10         **MR. SCHMIDT:**  Your Honor, may we approach?

11         **THE COURT:**  You may.

12   SIDEBAR CONFERENCE, AS FOLLOWS:

13         **THE COURT:**  This is about the supplementary report?

14         **MR. SCHMIDT:**  Yes, your Honor.

15         **THE COURT:**  Okay.  Where's the original report?

16         **MR. SCHMIDT:**  I have, I have copies of both for you

17   here, your Honor.

18         **THE COURT:**  That's what I want.

19         **MR. SCHMIDT:**  And I have -- this is the original.

20         **THE COURT:**  This is, this is the original.

21         **MR. SCHMIDT:**  This is the original.  And I have

22   tabbed and highlighted all the additional sections that they

23   have, they have placed.

24         **THE COURT:**  All right, that's very helpful.  And I

25   don't need oral argument on this.  The question, consistent

1    with what I said at the pretrial, if this is simply

2    explication of a conclusion in the original, that's okay; if

3    it's a new theory, a new basis, it's not, and we'll just

4    see.

5         MR. SCHMIDT:  The biggest issue I have, your Honor,

6    is they've expounded, not expounded, they've created a

7    causation theory.  Now he's talking -- initial disclosure he

8    said that the symptoms were predictable and up to the point

9    of Dr. Su's surgery and then he stops.  They're now talking

10   about everything that's happened and why she's the way she

11   is now.

12        THE COURT:  That's -- I understand.  And the line

13   I'm following, which is the fair line, I've said it from the

14   beginning, if it's new, I'm not letting him testify.  If it

15   is simply an explication, if there's a conclusory statement

16   in the original and she continues to suffer until today then

17   that would seem explication.  I'll take a look at it.

18        MR. GOROVITZ:  This is their supplemental.  And I

19   have yellow highlighted --

20        THE COURT:  The same sort of thing.

21        MR. GOROVITZ:  The same situation, sir.

22        THE COURT:  I understand.

23        MR. SCHMIDT:  I totally disagree.

24        THE COURT:  Well, of course you do.

25        MR. BORTEN:  You want the original?

1      **THE COURT:**  I do want the original.  Thank you.

2      **MR. BORTEN:**  That's the original and --

3      **THE COURT:**  And I will follow the same line for

4  both, and I'll just make my rulings as we go along.

5      **MR. SCHMIDT:**  Thank you, your Honor.

6      **MR. GOROVITZ:**  Thank you, your Honor.

7      (Whereupon the sidebar conference concluded.)

8      **THE COURT:**  Mr. Gorovitz, let's proceed.

9      **MR. GOROVITZ:**  Thank you, your Honor.  May we call

10  Dr. William Macaulay.

11      **THE COURT:**  He may be called.

12      **MR. GOROVITZ:**  Thank you.

13      **THE CLERK:**  Can you please remain standing and

14  raise your hand.

15      Do you solemnly swear the testimony you are about

16  to make in the matter now pending before this Court and Jury

17  will be the truth, the whole truth, and nothing but the

18  truth, so help you God?

19      **THE WITNESS:**  I do.

20      **THE CLERK:**  You can be seated.

21      WILLIAM B. MACAULAY

22      **DIRECT EXAMINATION**

23  BY  **MR. GOROVITZ**

24  **Q**   Good morning, sir.  The microphone does work.

25      Would you give the jury your full name, please?

1    A    Yes, my full name is William B. Macaulay, M.D.

2    Q    Thank you.

3         And again your profession is?

4    A    Orthopedic surgeon.

5    Q    Okay.  And, sir, what city or town do you live in?

6    A    I live in the village of Bronxville in New York.

7    Q    Okay.  In relation to New York City how far away is

8    that?

9    A    It's, it's within 15 miles.

10   Q    And what, what facility do you practice at?

11   A    I practice at New York Presbyterian Hospital at Columbia

12   University.

13   Q    And are there multiple locations that you practice at?

14   A    There are several office satellites.  I see patients

15   right there at the main hospital in northern Manhattan.  I

16   also see patients in midtown Manhattan on the west side, and

17   also see patients in Tarrytown, New York, and Westchester.

18   Q    Where did you graduate from college, Doctor?

19   A    I graduated from Trinity College in Hartford,

20   Connecticut in 1986.

21   Q    And did you go on to medical school from there?

22   A    I took two years to work as a research assistant in New

23   York and then went to medical school from there.

24   Q    Where was medical school at, please?

25   A    Medical school was at the College of Physicians and

1    Surgeons, Columbia University, where I currently work.

2    Q    Okay.  And after graduating from medical school did you

3    go into a medical specialty?

4    A    I did.  I chose to go into orthopedic surgery.

5    Q    And, sir, where did you receive your training at in

6    orthopedic surgery?

7    A    The residency training in orthopedic surgery was at the

8    University of Pittsburgh Medical Center.

9    Q    And how long was that, please?

10   A    That was a five year residency which followed a one year

11   general surgery internship.

12   Q    Okay.  Did you receive additional training in orthopedic

13   surgery beyond that?

14   A    I did.

15   Q    What was that -- what type of program was that, please?

16   A    That was a fellowship in adult reconstruction of the hip

17   and knee at the Hospital for Special Surgery in New York.

18   Q    What is the subspecialty of hip and knee replacement?

19   A    Essentially it's one of nine major subspecialties within

20   orthopedics where the people who perform this surgery are

21   typically reconstructing arthritic joints of the hip and

22   knee.

23   Q    Doctor, are you familiar with the term total hip

24   replacement?

25   A    Yes.

1    **Q**   And would you describe for the jury, please, what a

2    total hip replacement is?

3    A    Sure.   A total hip replacement is the most commonly

4    performed hip operation in the United States.   It's the one

5    that maybe you've heard of, friends or family have had it

6    done, when the joint becomes arthritic and the cartilage is

7    gone.   There's an acetabular component that's placed on the

8    pelvic side, and then there's a femoral component that's

9    placed inside the femur bone which has an extension, a

10   femoral head that then fits into the ball and socket joint

11   that you've reconstructed.   So that's a total hip

12   replacement.

13   **Q**   When you say acetabular component, does that have

14   another name.

15   A    The acetabular component is also sometimes referred to

16   as a shell or a socket.

17   **Q**   Now, do you perform total hip replacements as part of

18   your practice as an orthopedic surgeon?

19   A    I do.

20   **Q**   And, sir, over the course of your practice,

21   approximately how many total hip replacements have you

22   performed?

23   A    Approximately 2,000 total hip replacements.

24   **Q**   Are you familiar, Doctor, with the term hip resurfacing?

25   A    Yes.

1    **Q**   Could you describe to the jury, please, what a hip

2    resurfacing is?

3    A   Yes.  I certainly can do that in words.

4         Your Honor, I would like to pull out some, some

5    props.  Could I show the jury what it looks like

6    specifically?

7         **THE COURT:**  The ones that have been shown to Mr.

8    Schmidt you may.

9         **MR. GOROVITZ:**  If I could have this, please.

10        **THE COURT:**  And based upon what I see that's

11   everything except the Power Point, so --

12        **THE WITNESS:**  Correct.

13        **THE COURT:**  All right.  So, those other things you

14   may.

15        **THE WITNESS:**  Okay.

16        **THE COURT:**  Just so we understand what's going on

17   here.  This fellow, he wasn't there, he didn't do this

18   surgery.  We'll see if he's ever examined Ms. Rachmil-Etter.

19   It's not necessary whether he did or not.  But he's in here

20   saying I do this work, I understand how it's done, and I can

21   evaluate how Dr. Snyder did it.

22        Now, this is what we call an opinion witness.  And

23   that's fine.  When we're dealing with technical matters, in

24   this case, technical medical matters such as this, both

25   sides are entitled to call opinion witnesses who know about

1   this field of medicine and can give you their opinions.

2          Now, to the extent that I let him express his

3   opinions and teach us about these things, that's evidence.

4   Like any other witness, you can believe the entire thing,

5   you can disbelieve the entire thing, you can believe parts

6   of it disbelieve other parts.  So, you want to take into

7   account everything that you're being told about him, his

8   background, experience, training, et cetera, and what he's

9   basing his opinions on.  But that's how we get information

10  in cases.

11         With these opinion witnesses, though, just so you

12  understand what I'm doing, there are rules, special rules.

13  And one of the rules is everything an opinion witness is

14  going to say has to be first told to the other side so that

15  their opinion witness can deal with it.  And that's the

16  rule, we follow it.  And that's why I mentioned this

17  Power Point.  So we're not going to see any Power Point.

18  But these props have been shown to the other side, no

19  dispute about that, and this fellow can testify about them.

20  I'll try not to interrupt, but those are the rules for

21  opinion witnesses.

22         Go ahead, Mr. Gorovitz.

23         **MR. GOROVITZ:**  Thank you, sir.

24  **Q**   Sir, we were talking about your familiarity with hip

25  resurfacing, and are you familiar, please?

1   A   Yes, I am.

2   Q   Could you describe for the jury, and if necessary, with

3   his Honor's permission, please use your props.

4   A   Yes.  So, total hip resurfacing, or hip resurfacing in

5   this instance is a form of total hip replacement in which

6   the femoral neck, which is this part of the thigh bone, this

7   femoral neck is not cut off and removed, a standard total

8   hip replacement, this is cut off and a stem goes down inside

9   of the canal of the femur.  A resurfacing involves reshaping

10  the femoral head and putting a cap on, very much like a

11  crown would be put on your tooth by a dentist.  And the

12  concept here is that this would be the new ball that would

13  articulate with the acetabular component, or the socket

14  component that fits inside the hemi-pelvis, and those two

15  articulate like that.

16          THE COURT:  And just because I'm simpleminded, your

17  acetabulum, that's like one-half of the pelvis.

18          THE WITNESS:  This is one-half of the pelvis except

19  it's missing the sacrum, which is the bone in the back that

20  allows the two to be connected with each other.  So, a full

21  pelvis would have another, this is the left side, would have

22  another hemi-pelvis over here, which would be the right

23  side, they would be connected in the front in the symphysis

24  pubis, and they would be connected in the back with a bone

25  about the size of my hand called the sacrum.

1    **Q**    Thank you, Doctor.

2          Do you do hip resurfacings as part of your

3    orthopedic surgery practice?

4    A    I do.

5    **Q**    And, Doctor, over the course of your practice

6    approximately how many hip resurfacings have you performed?

7    A    Approximately 400.

8    **Q**    And as of 2007, which I will continue to bring you back

9    to, sir, approximately how many hip resurfacings had you

10   performed at that time?

11   A    Approximately a hundred.

12   **Q**    Now, Doctor, are you board certified in orthopedic

13   surgery?

14   A    Yes, I am.

15   **Q**    When did you become board certified, please?

16   A    I became board certified at the earliest possible

17   juncture, which was exactly two years following the

18   completion of my training which was the fellowship that

19   ended in '99.  So 2001, summer of 2001 is when I was board

20   certified.

21   **Q**    And, Dr. Macaulay, what is involved in becoming board

22   certified?

23   A    So, once you've completed the residency training at an

24   institution deemed accredited, then surgeons who would then

25   desire to go on to become board certified by the American

1    Board of Orthopedic Surgery would collect their cases that

2    had been done over the last year immediately prior to that,

3    and then those cases would be sent to the certifying agency.

4    They would look through there and pick out the cases that

5    were to be presented and discussed in an oral presentation

6    fashion.  So, surgeons typically in orthopedics will fly to

7    Chicago and do the oral portion of their boards.  There's

8    also a written portion of the boards that's taken, these

9    days at a computer, but back then it was by hand.

10   Q    And are you recertified with the board?

11   A    Yes.  Orthopedic Surgery has decided to require that all

12   orthopedic surgeons undergo something called Maintenance of

13   Certification, which would be ten years after you finish,

14   after you've been originally board certified, then you would

15   go ahead and become recertified with this thing called MOC,

16   or Maintenance of Certification, and that occurred for me in

17   2011, exactly ten years after.

18   Q    And you're currently in good standing with the board?

19   A    I am.

20   Q    Thank you.

21        Doctor, following your training could you briefly

22   describe what you did next in the field of medicine?

23   A    Sure.  Following my training at the Hospital for Special

24   Surgery and Adult Reconstruction Fellowship, I immediately

25   took a job where I currently am, that was 14 years ago, at,

1   at Columbia University's medical center.  It's also called

2   New York Presbyterian Hospital.

3   **Q**   Doctor, do you hold any teaching or academic positions?

4   A   I do.  I'm currently the Nas Eftekhar Professor of

5   Clinical Orthopaedic Surgery, which is the highest level of,

6   of promotion you can get within academia.  You start out as

7   an assistant professor and you move on to associate and then

8   full professor if you are deemed worthy.

9   **Q**   What is involved in that chair that you just described

10  to us?

11  A   What's involved is essentially the day-to-day taking

12  care of patients.  It's about 80 percent of what I do.  But

13  there's also, the other 20 percent are teaching and research

14  and administrative duties that I'm involved with that may

15  not happen on a, on a community level.

16  **Q**   Are you presently involved in teaching others out how to

17  practice orthopedic surgery?

18  A   Yes.

19  **Q**   And who do you teach?

20  A   I teach residents on a daily basis.  These are

21  orthopedic surgeons in training, that four or five year

22  training that we spoke about before.  I treat -- I teach on

23  a daily basis an adult reconstruction fellow.  I personally

24  started this fellowship six years ago, seven years ago at

25  Columbia.  And since it is a medical school right there,

1    we're very active in teaching the medical students at

2    Columbia as well.

3    **Q**    Doctor, are you involved in research projects in the

4    field of orthopedic surgery?

5    A    I am.

6    **Q**    Could you briefly describe for the jury what's involved,

7    what type of projects you're involved with?

8    A    I'm typically interested in projects that involve

9    learning more about recuperation enhancing methods and

10   avoidance of complications in both hip and knee surgery.

11   **Q**    Okay.  Doctor, are you involved in any professional

12   organizations involved with orthopedic surgery.

13   A    Yes.

14   **Q**    Could you tell the jury briefly some of those

15   organizations, please?

16   A    Yes.  They would include, but are not limited to, the

17   American Academy of Orthopedic Surgery, the double A O S.

18   Another one would be the double A H K S, the American

19   Association of Hip and Knee Surgeons which is a group of hip

20   and knee surgeons from all over country who have a certain

21   volume of joint replacement as the primary focus of their,

22   their practice.

23        I'm a member of the Hip Society which is a fairly

24   exclusive group of hip surgeons in the U.S, only about 90

25   surgeons currently active, who are invited to be a part of

1    that.

2         The American Orthopedic Association, the A O A, is

3    a group of orthopedic thought leaders and educators who are

4    part of that organization.

5         There's a number of others but those are probably

6    the most pertinent to this.

7  **Q**   Okay.  Doctor, have you published any articles in the

8    field of orthopedic surgery?

9  A   Approximately 75 peer-reviewed journal articles,

10   scientific original works.

11 **Q**   And are all of these in the area of hip surgery?

12 A   No, they're about evenly spread between hip and knee

13   surgery, and the treatment of hip fractures.

14 **Q**   Doctor, you used the term peer review.  Could you tell

15   the jury, please, what that means?

16 A   Well, a peer-reviewed journal is one in which the people

17   who run the journal decide to get folks like myself who are

18   in the community practicing all the time, perhaps at

19   teaching institutions, perhaps not, to, to either pay those

20   people or to get them to volunteer to review the articles

21   and decide on their scientific merit and whether it's worthy

22   of publication in their journal.

23 **Q**   Are all articles that are submitted to a peer-review you

24   publication actually published?

25 A   No, no, certainly not.  It would depend on the journal,

1   of course.  But there certainly is, the majority of journals

2   that I publish in, the majority of articles that are sent in

3   are actually rejected and not published.

4   **Q**   Okay.  Doctor, are you familiar with the standard of

5   care expected of physicians practicing in the specialty of

6   orthopedic surgery in Massachusetts?

7   A   I am.

8   **Q**   Could you tell us what that is, please?

9   A   Sure.  The standard of care in the Commonwealth of

10  Massachusetts now or in 2007 would be similar to the

11  standard of care that would be expected of the average

12  orthopedic surgeon practicing in another metropolitan area

13  such as the one that I'm from in New York City.

14  **Q**   Is the standard of care of the orthopedic surgeon, is

15  that a national standard?

16  A   It is.

17  **Q**   Doctor, I'd like to ask you this question.  Have you

18  previously reviewed cases referred to you for the evaluation

19  of appropriateness of medical care rendered as a physician?

20  A   I have.

21  **Q**   Approximately how many cases in your career have you

22  reviewed from that perspective?

23  A   I probably have reviewed somewhere in the neighbor of

24  ten cases over the course of fourteen years.

25  **Q**   Fourteen years.

1          Do you recall, Doctor, how many of those cases were

2  referred to you by counsel for the plaintiff, in other words

3  the person, who was alleging wrongdoing?

4  A   I really only have memory of those where I actually

5  ended up testifying, so I'll speak to those three actually.

6  Even though I've reviewed more cases, in the vast majority

7  I've decided not to get involved with because they seemed

8  without merit.

9          So, I have testified on three of those cases that I

10  reviewed and two of those were referred to me by plaintiff's

11  lawyers and one was referred to me from a defendant's

12  lawyer.

13  Q   Doctor, do you charge for your services in these legal

14  cases --

15  A   I do.

16  Q   -- for your review?

17          Doctor, at some point were you contacted by our

18  office to review cases in this case involving the claims of

19  Sheryl Rachmil-Etter against Dr. Snyder?

20  A   Yes.

21  Q   And were you provided with medical records to review?

22  A   Yes.

23  Q   Do you recall reviewing the records of Dr. Blazar?

24  Blazar?

25  A   I do.

```
1    Q    Okay.  Dr. Bierbaum?

2    A    Yes.

3    Q    Dr.  Marchand?

4    A    Yes.

5    Q    Do you recall reviewing the medical records of the

6    defendant in this case --

7    A    Yes.

8    Q    -- Dr. Snyder?

9         Do you recall reviewing the medical records of Dr.

10   Su?

11   A    Yes.

12   Q    Do you recall reviewing the medical records from a pain

13   management physician?

14   A    Dr. Chopra, yes.

15   Q    And also some physical therapy records?

16   A    Yes.

17   Q    Doctor, do you also recall reviewing some deposition

18   proceedings?

19   A    Yes.

20   Q    Transcripts of depositions that were taken?

21   A    Yes.

22   Q    And do you remember whose depositions you reviewed?

23   A    Those included Cheryl's, the plaintiff, the defendant,

24   Dr. Snyder.  I reviewed my deposition.  I reviewed that of

25   Dr. Woods.  I reviewed that of Dr. Marchand.
```

1    Q    Doctor, in connection with this case, did you review any

2    medical literature specifically referencing this case?

3    A    Not specifically referencing this case.  As part of what

4    I do as an educator, I'm constantly reviewing the literature

5    and evaluating it as I serve on several editorial boards for

6    journals.  But I did not need to go to specific journal

7    articles for this particular case.

8    Q    Doctor, are you charging the firm of Gorovitz & Borten

9    for your services in this case?

10   A    I am.

11   Q    And are you charging on an hourly basis?

12   A    Yes, for review of records, per hour, yes.

13   Q    And how much is that, please?

14   A    $500 per hour.

15   Q    Okay.  And for your deposition testimony?

16   A    The same.

17   Q    Okay.  And for your appearance here in court, do you

18   charge on a day basis or by an hourly basis?

19   A    Usually a half day or a day basis.  Since required

20   traveling here last night, it will be for a day.

21   Q    Okay.  And your day basis charge is?

22   A    $8,000.

23   Q    In addition, I'm assuming that you stayed at a hotel

24   last night?

25   A    Right.

1    **Q**   And the cost of coming up from New York and the hotel,

2    is that also charged to the law firm?

3    A    Yes.

4    **Q**   Doctor, are you familiar with the standard of care

5    regarding the performance of a Birmingham hip resurfacing

6    procedure in 2007?

7    A    I am.

8    **Q**   Does your familiarity with the standard of care include

9    patients who are undergoing a Birmingham procedure and have

10   a condition known as hip dysplasia?

11   A    I am aware.

12   **Q**   Are you familiar with the standard of care regarding the

13   care and treatment of a patient who incurs a hip dislocation

14   during a Birmingham procedure that is diagnosed while the

15   patient is still in the recovery room?

16   A    I am.

17   **Q**   Does that include a patient who has hip dysplacia who

18   undergoes a Birmingham procedure and suffers a hip

19   dislocation that is diagnosed while the patient is still in

20   the recovery room?

21   A    I'm familiar.

22   **Q**   Does your familiarity with the standard of care, Doctor,

23   include options or exit strategies, if you will, that are

24   available to an orthopedic surgeon in the setting of having

25   performed a Birmingham procedure on a patient with hip

1   dysplacia who is diagnosed with a dislocation while the

2   patient is still in the recovery room?

3   A   Yes, it does.

4   Q   You're familiar with that?

5   A   Yes.

6   Q   Okay.  And again, we're talking about a national

7   standard of care?

8   A   Yes.

9   Q   Okay.  Doctor, have you undergone any specific training

10  with regard to the Birmingham hip resurfacing process?

11  A   I have.

12  Q   When did that occur, Doctor?

13  A   The first formal training I had was, was back in 2006

14  when it became clear that the Birmingham hip resurfacing,

15  the BHR we're call it, was going to be FDA approved in the

16  United States, and later that year I decided to go back to

17  the UK for formal training with one of the innovators.  His

18  name is Ronan Treacy.  That came on the heels of previous

19  training which was informal but in the operating room with

20  Dr. McMinn when I visited him in 2004 as part of a

21  fellowship called the British Traveling Fellowship.

22  Q   Now, is Dr. McMinn related to Dr. Treacy in any way with

23  regard to the Birmingham procedure?

24  A   They are both considered innovator or designer surgeons.

25  Q   Of the Birmingham process?

1    A    Correct.

2    Q    Okay.  And when you were with Dr. Treacy did you observe

3    surgeries that he performed?

4    A    I did, and I participated as well.

5    Q    Approximately how many in total did you observe and

6    participate in?

7    A    Six.

8    Q    And then when you were with Dr. McMinn did you observe

9    procedures with him?

10   A    I did.

11   Q    Approximately how many?

12   A    Ten.

13   Q    And did you participate in any with him?

14   A    No, I was an observer in the room, but had access to

15   video footage and his, his audio describing the procedure.

16   Q    Okay.  And when you came back to the United States did

17   you undergo any further training in performing the

18   Birmingham procedure.

19   A    There was an additional course that was put together by

20   Smith & Nephew to train surgeons additionally on the

21   procedure.

22   Q    And did you participate in that?

23   A    I did.

24   Q    Doctor, did you eventually become involved with Smith &

25   Nephew in any capacity?

1    A    I did.  Back in 2007, I was working for them as a

2    consultant surgeon which meant at the time I would allow

3    Smith & Nephew to bring surgeons from around the country, or

4    actually around the world, to my operating room to observe

5    surgery and to, and to be educated on how to do it.

6    Q    So were you an instructor on behalf of Smith & Nephew in

7    the Birmingham procedure?

8    A    I was.

9    Q    Doctor, was there any requirement in 2006 in this

10   country as to education or training that a surgeon had to

11   undergo in order to utilize the Birmingham procedure?

12   A    There was.

13   Q    And what was that, please?

14   A    At a minimum at that time it included a surgical

15   visitation to an operating room like mine.  I don't think it

16   was mandatory but it was highly advisable that surgeons also

17   make the trip to the UK to meet the designer surgeons.

18   Q    And when, Doctor, did the Birmingham procedure become

19   approved by the FDA?

20   A    That was in May of 2006.

21   Q    Doctor, as part of the teaching did Smith & Nephew have

22   a physicians technique brochure?

23   A    Yes, they did.

24   Q    Okay.  And I'm just looking for --

25        Referencing a pamphlet called Physicians Technique,

1   are you familiar with that?

2   A   I am.

3   Q   And who produced that booklet, that pamphlet?

4   A   That was the Smith & Nephew corporation in concert with

5   the designing surgeons.

6   Q   And do you recall its publication date?

7   A   I believe it was December of '05.

8   Q   So was that in effect when you were training on the

9   Birmingham process?

10  A   It was.

11  Q   And did you rely upon the material in that pamphlet in

12  order to understand the Birmingham process?

13  A   Yes.  It was very important that we teach the procedure

14  exactly the way the designing surgeons wanted it to be done.

15  Q   And did you utilize the material from that brochure when

16  you were teaching as you just testified other surgeons who

17  wanted to become familiar with the Birmingham process?

18  A   Yes.

19  Q   Okay.  And do you recall, Doctor, if within that

20  pamphlet there was a section involving dysplacia cups?

21  A   There is.

22  Q   Okay.  And were you instructed through that brochure how

23  to utilize the dysplacia cup in the Birmingham process?

24  A   Yes.

25  Q   And was there also information in there regarding when

1   to utilize the dysplacia cup?

2   A    There is.

3   Q    And did you take that into account when you were

4   teaching other surgeons how to do a Birmingham procedure?

5   A    Yes.

6   Q    And how to treat dysplacia patients who were about to

7   undergo the Birmingham procedure?

8   A    Yes.

9       **MR. GOROVITZ:**  Your Honor, at some point before the

10  break, I do have a clean copy that I would like to present

11  to the witness, but I'm not able immediately to put --

12      **MR. BORTEN:**  It's on the stand.  It's on the stand.

13      **MR. GOROVITZ:**  Okay.  I'm sorry, if I could just --

14  your Honor, I'm sorry.

15      **THE COURT:**  Sure.  Proceed.

16      **MR. GOROVITZ:**  Thank you.

17  Q    Doctor, could you take a look at the booklet that I've

18  just given you, please.  And is that the surgical technique

19  that we were just talking about that was issued by Smith &

20  Nephew in 2005?

21  A    It is.

22  Q    And is that the pamphlet that you took into

23  consideration in order to become educated about the process?

24  A    Yes.

25  Q    And is that the pamphlet that you took into

1    consideration when teaching others?

2    A    Yes.

3    **Q**    Did you find that pamphlet to be reliable?

4    A    Yes.

5         **MR. SCHMIDT:**  Okay.

6         **THE COURT:**  No, he may so testify.

7         **MR. GOROVITZ:**  Your Honor, I would like to move to

8    have this document introduced as the next marked exhibit,

9    please.

10         **MR. SCHMIDT:**  Objection.

11         **THE COURT:**  Well, do you have knowledge, either

12    through your teaching or through your practice in the

13    hospital, whether, you worked for these folks, but whether

14    that pamphlet is generally considered authoritative?  Do you

15    have a view of that?

16         **THE WITNESS:**  I believe it is generally considered

17    authoritative, yes.

18         **THE COURT:**  By physicians in this area, at least as

19    of the time of publication?

20         **THE WITNESS:**  Yes.

21         **THE COURT:**  Is that right?

22         **THE WITNESS:**  Yes.

23         **THE COURT:**  Overruled.  It may be admitted.  It

24    will be Exhibit 4 in evidence.

25         (Exhibit marked in evidence.)

1    **Q**   Doctor, continuing with the Birmingham process, could

2    you explain to the jury, please, what happens in a

3    Birmingham procedure, and please utilize the props if you

4    need to.

5    A   Sure.

6           Generally speaking, the patient's positioned on

7    their side with the operated side up on an operating table.

8    After anesthesia is introduced an incision is made.   The

9    surgeon exposes the hip joint and moves the rather large

10   femoral head out of the way.   Usually when you do a

11   posterior approach like I do, and was done in Sheryl's case,

12   the femoral head is moved to the front and upper part of the

13   socket, and then the surgeon works on the socket, prepares

14   it by taking out the soft tissue and getting down to

15   bleeding bone as opposed to cartilage, and then wedging the

16   acetabular component, also known as the shell or the cup, it

17   looks like this, and the socket is reamed to a hemisphere.

18   These reamers are, they kind of look like reverse cheese

19   graders.   Instead of being flat they're shaped like

20   hemispheres.   And the cheese grader aspect of it sort of

21   juts out on the outer part of this, and it takes away the

22   soft tissue, the cartilage, and allows the surgeon to ream.

23          In this instance, the plaintiff received a 50

24   millimeter socket, but the socket was prepared by reaming to

25   49 millimeters.   And that's the width of the diameter of the

1    socket.  And then the cup is impacted into place and it's

2    wedged in there and held in place with these, those two fins

3    serve to, serve as additional fixation in the pubis and the

4    ischium inferiorly.

5         Once the socket's placed then the surgeon begins

6    working on the femoral head.  And the femoral head is a ball

7    of the ball and socket joint.  The job of the surgeon is to

8    change that ball into the shape of a cylinder.  And by

9    making it the shape of a cylinder then this component can

10   fit over the top of it and that's placed on with a cement

11   grout.  You can't see it but the grout's underneath here,

12   and it forms a solid fixation with the femur bone right from

13   the start.  Then it's put back in the socket, stability

14   testing takes place, usually a capsule repair, and the

15   surgery's finished.

16   **Q**   Doctor, are you familiar with the term hip dysplacia?

17   A   Yes.

18   **Q**   Can you describe hip dysplacia for the jurors?

19   A   Sure.  Sure.  Hip dysplacia is a spectrum of disease.

20   Hip dysplacia in this instance when it involves humans, more

21   often it involves females than males for some reason, it, it

22   involves a, let's say an older morphology, which is to say

23   the shape of the hip joint is different from the average

24   person.  And the shape differences usually manifest

25   themselves in the fact that the acetabulum, or the socket of

1    the ball and socket joint, is usually, it's a little bit

2    more shallow.  It's shaped more like a saucer than a cup.

3    Whereas the normal socket looks like a cup, the dysplastic

4    socket is a little bit more shallow and devoid of bone at

5    the, at the periphery, at the edge.  This results in a

6    situation as happened in the plaintiff, you know, many years

7    ago when the cartilage started to wear out because of

8    faltered stresses within the hip joint.  So the spectrum of

9    disease can involve patients in their teens, some, some

10   teenagers, yes, end up with hip replacements as a result of

11   this.  And sometimes the arthritis doesn't manifest itself

12   until a patient's in their 80's or 90's.  And the spectrum

13   of disease can follow, can involve patients all the way

14   through those ages.

15   **Q**    Doctor, is hip dysplacia a concern when a Birmingham

16   procedure is being performed?

17   A    It's an important concern because it's a more difficult

18   procedure.

19   **Q**    And specifically what is the concern?

20   A    The concern is the relative paucity or lack of bone at

21   the periphery.  If you're trying to place this, this

22   acetabular component, this socket, and have it fully placed

23   within the bone, if the bone is deficient it's

24   understandable that you may not be able to get fixation or

25   have it positioned just the way you want.

1  **Q**   And within the Birmingham process, does the Birmingham

2  process provide for a hip dysplacia cup?

3  **A**   Yeah, the hip dysplacia cup is designed to give the

4  surgeon additional fixation so he or she can place the

5  socket in a position that's more likely to maintain

6  stability and function for years.

7  **Q**   Doctor, are you familiar with the term anteversion?

8  **A**   I am.

9  **Q**   As it pertains to a Birmingham procedure?

10  **A**   Yes.

11  **Q**   Can you explain anteversion to the jury, please?

12  **A**   Sure.  The term anteversion, let's break it down into

13  its parts.  Version, think of the word version means turn.

14  So, so, you know, someone could turn their head this way or

15  this way.  An acetabular component can be verted, or have a

16  version upon placement which is different from one case to

17  another.

18       This, this is a left hemi-pelvis that I'm holding

19  in front of me.  So, imagine -- I'm holding the front part

20  towards you right now.  In a similar way, as if this were my

21  pelvis, the left side being here, imagine a right iliac wing

22  over here and the right hip joint would be down here.

23       **MR. GOROVITZ:**  Judge, if you wouldn't mind, could

24  the doctor step down in order to more clearly show that to

25  the jury, if you wouldn't mind.

1          **THE COURT:**  If you want, he may.  Keep your voice

2     up because you're away from the mic.

3          **THE WITNESS:**  Yes.

4     A    So the concept of version has to do with how much the

5     acetabular component is pointing towards the front, in other

6     words, towards you.  If the cup is placed like this,

7     straight out to the side, that's neutral version, or

8     zero degrees of anteversion, zero degrees of retroversion.

9     If it's placed directly towards you that's 90 degrees of

10    anteversion.

11         So that's what version means.

12    Q    Doctor, is there a clinical significance to the number

13    of degrees in anteversion?

14    A    There is.

15    Q    Could you tell us what that is, please?

16    A    Well, hip surgeons typically try to place acetabular

17    components like this between five degrees of anteversion and

18    25 degrees of anteversion depending on the patient's

19    anatomy.

20    Q    And if it is placed beyond 25 degrees is there an

21    implication to the patient?

22    A    There are.  There are implications in the potential for

23    dislocation or mechanical impingement that can occur between

24    the, the neck of the prosthesis versus the acetabular

25    component of the prosthesis or the patient's native neck

1    versus the prosthesis indicates a resurfacing.

2    **Q**    Doctor, you may have to step down again if you think

3    necessary.  Are you familiar with the term inclination as it

4    pertains to the Birmingham procedure?

5    A    Yes, I'm familiar with inclination.  The inclination

6    angle is also referred to as abduction angle, the AB duction

7    angle.

8              Your Honor, may I approach the jury once more?

9              **THE COURT:**  You may.

10   A    So, if this is the left hemi-pelvis again, also called

11   the coccyxl bone, the inclination angle would be an angle

12   between the line that's drawn tangential to the front of the

13   socket and have, and where that intersects with the floor,

14   like over here.  So, in this instance, with a properly

15   placed socket, that's about 45 degrees.  And surgeons

16   typically shoot between 35 and 50 degrees for the placement

17   of that socket.

18   **Q**    With regard to inclination, Doctor, if the angle is not

19   within the range that you said of 35 to 50 degrees is there

20   a clinical significance to the patient?

21   A    There could be many significant consequences for that.

22   **Q**    Could you briefly describe them, please?

23   A    Sure.  They have the same kind of consequences as does

24   an improperly placed acetabulum as it relates to the

25   anteversion angle.  The patient could be at risk for

1    dislocation, which is when the prosthetic femoral head exits

2    out of the socket.  Or it could have implications for

3    impingement where the neck of the femur impinges on the edge

4    of the socket.  Or it can have implications for wear, the

5    generation of wear particles, in this instance metal because

6    it's a metal-on-metal implant.

7    Q    Are you familiar with the term too, T O O, as opposed to

8    the number, horizontal when talking about a Birmingham

9    procedure?

10   A    Sure.  And the same term too horizontal could refer to

11   an acetabular component of a total hip replacement.

12          Hip surgeons typically when they're describing the

13   position of the inclination angle, we talked about maybe

14   shooting for somewhere between 35 and 50 degrees inclination

15   angle, if the cup is too horizontal or too flat then the,

16   then the actual, the actual situation could be bad in terms

17   of impingement.

18   Q    Are you familiar with the term trialing?

19   A    Yes.

20   Q    As it applies to a Birmingham procedure?

21   A    Yes.

22   Q    Could you briefly explain trialing to the jury, please?

23   A    Sure.  We use, we use the word trialing to describe what

24   happens at the end of the case before the surgeon begins to

25   close the closure.  He or she wants to make sure that by

1    taking the leg through all physiologically important ranges

2    of motion that the hip is stable, that the femoral head does

3    not exit out of the socket.  And that's an important part of

4    the procedure, trialing.  In this instance, trialing is done

5    with the final implants when it's a total hip, trialing is

6    done with provisional implants that can be taken out and put

7    back in.

8    **Q**    Doctor, would trialing detect if a cup component is

9    loose?

10   A    Yes.

11   **Q**    Would trialing detect that there is an impingement?

12   A    Yes.

13   **Q**    Now that we're to the word impingement, are you familiar

14   with that term as it pertains to a Birmingham procedure?

15   A    I am.

16   **Q**    Would you be kind enough, please, to describe that to

17   the jury?

18   A    Sure.  Impingement, when it's used in connection with a

19   hip resurfacing of any kind, but the Birmingham in this

20   instance, impingement occurs when the patient takes the leg

21   through a range of motion and the neck, and that's part of

22   the benefit of this procedure, leaving the neck in place,

23   when the neck impinges on the edge of the socket.  And when

24   that, when that contact between the neck and the metal of

25   the socket, the acetabular component, happens then that's

1    painful.

2    **Q**   Does it result in a reduction of range of motion?

3    A   It does.  It's a firm block to the range of motion.

4    **Q**   Okay.  Should impingement be detected before the surgeon

5    closes up the patient?

6    A   Yes, that's essential.

7    **Q**   And how would that be done, please?

8    A   By taking the femur bone of the patient's leg through a

9    range of motion.  And typically we don't just measure what

10   would be the day-to-day movements like simple walking or

11   riding a bike, but it might also include doing additional

12   stretching as one might do in yoga.

13   **Q**   Doctor, does sending a patient home who has impingement

14   following a Birmingham procedure have clinical significance?

15   A   It does.

16   **Q**   Could you tell us what that is, please?

17   A   Sure.  If someone is impinging they're unable to, you

18   know, if the impingement is severe and happens early then

19   someone's unable to walk normally, they might be in chronic

20   pain.  That inability to move around and be in chronic pain

21   is likely to cause muscle atrophy and waste.

22   **Q**   Doctor, are you familiar with the term called exit

23   strategy as it pertains to a Birmingham procedure?

24   A   Sure.  Exit strategy is, is also referred to as

25   something called a bailout.  In other words, surgeons

1    always, who do this procedure, always consent the patient

2    for the possibility that they might wake up with a total hip

3    replacement, because you can't always predict going in to

4    the surgery that these impingement problems aren't going to

5    happen by the time the implants are in position.

6    **Q**   What choices are available in a Birmingham procedure if

7    the doctor encounters a complication?

8    A    If the doctor encounters a complication -- well, it

9    would depend on what that complication is.  But in this

10   instance, if the complication was instability then the

11   surgeon could reposition the socket and perhaps enhance the

12   soft tissue repair at the end of the operation.  If the

13   problem was impingement the surgeon could reposition the

14   socket again to try to avoid impinge.  But if ultimately

15   impingement's there the only way to get out of that problem

16   is to convert to a total hip replacement.

17   **Q**   And you said before that typically the consent form

18   provides for a total hip replacement?

19   A    Yes.

20   **Q**   And that's part of the, you used the word bailout, in

21   addition to exit strategy?

22   A    Right.

23   **Q**   Doctor, you've reviewed quite a few materials that

24   you've told us earlier on.  I would like to ask you some

25   questions from those reviews.

1          Did you find if Ms. Rachmil-Etter had a history of

2    hip dysplacia?

3    A    Yes.  It was clear from multiple sources that Sheryl had

4    significant hip dysplacia as a child.

5    Q    And that continued on through into her adult life?

6    A    Yes, and was the primary cause of her hip arthritis.

7    Q    Did you find if Ms. Rachmil-Etter had developed

8    osteoarthritic changes?

9    A    That was described in the, in the records of several

10   surgeons, yes.

11   Q    Okay.  Did you find if she had developed a left-sided

12   anterior/superior acetabular degeneration?

13          **MR. SCHMIDT:**  Objection.

14   A    Yes.

15          **THE COURT:**  Well, no, no, the pause is for me.

16          **THE WITNESS:**  Okay.

17          **THE COURT:**  I have to do my little part.

18          **THE WITNESS:**  Okay.

19          **THE COURT:**  And it may take me a moment.

20          What are the grounds?

21          **MR. SCHMIDT:**  Leading, your Honor.

22          **THE COURT:**  Well, I'm going to allow that answer to

23   stand.  Don't lead this witness.

24          Go ahead.

25   Q    Doctor, I would like to turn your attention, please to

1    page 14 of the jurors' handbook.

2    A    Okay.

3    Q    Page 14, please.

4         And the numbers are at the lower right hand side.

5    A    Yes.

6    Q    Did your review indicate any discussion by Dr. Snyder

7    regarding whether or not Sheryl was an appropriate candidate

8    for hip resurfacing?

9    A    Yes.  The feeling was that she was an excellent

10   candidate.

11   Q    Could you just take a look at plan at the bottom.  Is

12   this your reference?

13   A    Yes.

14   Q    Sheryl is an ideal?

15   A    Sheryl is an ideal candidate is what the plan was.

16   Q    Okay.  Would you turn, please, in the jurors' handbook,

17   Doctor, to page 17.  Do you recognize his document, Dr.

18   Macaulay?

19   A    I do.

20   Q    And what is it, please?

21   A    This is a consent for total joint arthroplasty hip

22   replacement left hip resurfacing.

23   Q    And is this what you were referring to in your earlier

24   testimony?

25   A    Yes.

1   **Q**   About being consented for both procedures?

2   A   Yes.

3   **Q**   Would you turn, please, to page 41 in the jurors'

4   handbook.

5   A   Okay.

6   **Q**   And do you recognize this, please?

7   A   Yes, this is the operative report by Dr. Snyder of the

8   surgery of that day.

9   **Q**   Doctor, do you find anywhere in your review of this

10   article that Dr. Snyder may have trialed the patient before

11   closure?

12   A   There's not, there's not a thorough description of

13   trialing or, or instability testing.

14   **Q**   Would you turn, please, back just a few to page 32 of

15   the jurors' handbook.

16   A   Okay.

17   **Q**   Do you see on page 32 at what time that

18   Ms. Rachmil-Etter was sent to the PACU.

19   A   Time out of the operating room was 12:36.

20   **Q**   Would you go, please, to page -- I'm sorry, stay on

21   page 36.  Page 36.  Are you aware if there was a radiology

22   taken approximately one hour after the surgery completed?

23   A   There was.  This, this is the radiology report from the

24   X ray done in the recovery room.

25   **Q**   Would you please read to the jury, please, what the

1    findings were of this X-ray report.

2    A    Sure.  The impression was superior migration of the

3    femoral prosthetic component.

4    Q    Doctor, what does that mean?

5    A    That means that the hip was dislocated in the recovery

6    room.

7    Q    It was found in the recovery room?

8    A    Yes.

9    Q    Do you know if the patient was taken back to surgery?

10   A    Yes, she went back to surgery later that day.

11   Q    And do you know what type of surgery was performed in

12   the second setting on Ms. Rachmil-Etter?

13   A    Sure.  The second surgery that day was entitled revision

14   left total hip resurfacing.

15   Q    Could you go, please, to page 46, Doctor.

16   A    Yes.

17   Q    Is that an operative report of the second surgery?

18   A    It is.

19   Q    Did you find any reference in there by Dr. Snyder as to

20   whether or not Ms. Rachmil-Etter was stable or unstable?

21   A    I'm going to take a moment to read through here to

22   refresh my memory, okay?

23   Q    I just call your attention starting, the sentence

24   starting at the third line, please, under indications for

25   surgery.

1   A   Yes.  She was found to be very unstable at the time of

2   that surgery.

3   **Q**   And what was she noted to have, Doctor?

4   A   It says that she was noted to have a retroverted

5   acetabulum.

6   **Q**   And if you can just continue the sentence.

7   A   On the nonoperative side and corrective placement of the

8   left operative side left her very unstable.

9   **Q**   If you continue on, do you see any reference to Dr.

10  Snyder trialing the patient at the conclusion?

11  A   No, there's no reference to stability testing or

12  trialing at the end of the surgery.

13  **Q**   If you look at the sentence that begins, the line six

14  lines in to indications for surgery.  The patient was in

15  the?  Do you see that?

16  A   The patient was in the lateral position.  Yes.

17  **Q**   If you could just continue reading, please.

18  A   Under general anesthesia and had the hip exposed and the

19  position of the cup was changed to match her natural

20  retroverted acetabulum and then trial reductions were done

21  and this gave a completely stable hip in all ranges of

22  motion.

23  **Q**   Okay.  I would like you to assume, Doctor, that there's

24  been testimony here that the term retroverted actually meant

25  anteverted.  If you see where it says retrovert there, I

1    would like you to assume that there's testimony that the

2    word should correctly be anteverted.

3    A    Yes.

4    **Q**    Okay?

5         Do you have an understanding, Doctor, if the cup

6    position was changed?

7    A    Yes, it looks quite different in the X rays following

8    the second surgery, very different from what they were after

9    the first surgery.

10   **Q**    And then trial reductions were done.  What does that

11   mean to you, Doctor?

12   A    That means that the patient's leg was taken through

13   ranges of motion to ensure stability.

14   **Q**    Now, within that range of motion to ensure stability,

15   Doctor, would the surgeon able to detect the potential for

16   another dislocation?

17   A    Yes.

18   **Q**    Would the surgeon be able to detect the potential for

19   impingement?

20   A    Absolutely.

21   **Q**    And if the surgeon detected impingement at the end of

22   the second surgery, can you tell us, please, if any

23   intervention should take place?

24   A    Sure.  It's my opinion that if significant impingement

25   is happening during physiologically important ranges of

1   motion then the, then the alternative at this point would be

2   to convert her to a total hip replacement.  If, you know,

3   the balance between dislocation potential and impingement

4   left her in an untenable situation then total hip

5   replacement was the answer that day.

6   Q   And in this case the patient had consented for a total

7   hip replacement?

8   A   Yes.

9   Q   Doctor, are you aware that the patient was discharged

10  from the hospital a few days later?

11  A   Yes.

12  Q   Do you know if at some point she entered physical

13  therapy?

14  A   Yes, she did.

15  Q   Now, if you would turn, please, to page 28 in the

16  jurors' handbook.

17  A   Okay.

18  Q   Do you recognize this as a record from Dr. Snyder of

19  December 2007?

20  A   Yes, I do.

21  Q   You've seen this record before; is that correct?

22  A   Yes.

23  Q   Do you see a recommendation for the continuation of

24  physical therapy to Ms. Rachmil-Etter?

25  A   Yes.

```
 1    Q    And is there a indication as to why she should continue

 2    with the physical therapy?

 3    A    Yes.

 4    Q    And that is?

 5    A    Due to the complicated nature of the surgery.

 6    Q    Doctor, would be kind enough to go, please, to go to

 7    page 29, the next page in the jurors' handbook.

 8    A    Yes.

 9    Q    An office note from Dr. Snyder of January 22, 2008.  You

10    reviewed this document before, did you?

11    A    Yes.

12    Q    Did you see here an expression of unhappiness by Ms.

13    Rachmil-Etter with regard to her then position following

14    surgery?

15    A    Yes, that was described.

16    Q    And it's described how?

17    A    It's described that she was not happy with her comfort

18    or functional level.

19    Q    Okay.  And do you see a suggestion by Dr. Snyder as to

20    how much further out she might need to go in order to

21    achieve improvement?

22    A    Yes, the suggestion is made that she would probably need

23    to convert to a total hip replacement.

24    Q    Okay.  So, Dr. Snyder here, there's a suggestion under

25    plan that a total hip replacement may be required?
```

1    A    Yes.

2    Q    Doctor, would you go, please, to page 54.

3    A    Yes.

4    Q    Page 54, please.

5         And this is an office note from Dr. Edwin Su at the

6    hospital for special surgery in May of 2008.  Did you have a

7    chance to review this note previously?

8    A    Yes, I did.

9    Q    Would you turn, please, then to page 55 within the note.

10   And I'm referencing the top paragraph that begins:  This is

11   a pleasant, fit-appearing woman.  And then there is a

12   discussion here of a number of degrees regarding her motion.

13        Had you seen that before?

14   A    Yes.

15   Q    Doctor, what does this mean, please?

16   A    So, it's described by Dr. Su that her range of motion of

17   her hip was limited.  He found that she could only flex to

18   about 95 degrees, which is only slightly greater than a

19   right angle.  Most people who have had hip resurfacing can

20   flex their hip up close to normal which is near 140 degrees.

21        It's also described that she only has about

22   20 degrees of external rotation which is painful, and normal

23   degree of external rotation of a hip is in the, on the order

24   of 60 to 70 degrees.  However, she had increased range of

25   motion in internal rotation, which is when the knee is

1    brought towards the midline and the leg is rotated

2    internally.  Normal is about 20 degrees, but this patient

3    post-surgery could internally rotate about 45 degrees.  And

4    the abduction, the ability to bring the leg away from the

5    body, which normally is 45 degrees for most muscle bound

6    men, perhaps 70 or 80 degrees for a thin dysplastic woman,

7    she could only abduct her hip about 30 degrees.

8    Q    Does this suggest a condition of some type, Doctor?

9    A    Yes, these are all suggestive of impingement.

10   Q    If you could just continue on into the section of

11   radiographic exam on that page.  Perhaps fifth line down.

12   There's an indication here that the cup has been placed in a

13   very horizontal position.

14   A    There is.

15   Q    Doctor, just very briefly, what does that mean?

16   A    Sure.  Horizontal position means rather flat.  If an

17   acetabular component is placed in the zone that we're hoping

18   to get, which is 35 to 50 degrees of AB duction, or

19   inclination angle, then it doesn't appear flat to the

20   surgeon.  If it appears horizontal, he's suggesting that the

21   angle is less than 30 degrees.  In this instance it looked

22   about 25 degrees inclination angle.

23   Q    And does that present a potential condition to the

24   patient?

25   A    Yes.  It suggests the potential for impingement.

1    Q    Still under the radiographic piece there's an indication

2    that the fins are turned superiorly.

3           Doctor, the fins, is that what you referred before

4    when you held up the cup?

5    A    I did.

6    Q    Doctor, in what manner which the fins be applied during

7    the course of the resurfacing procedure?

8    A    The fins, the fins should be applied inferiorly.  There

9    are two fins and there are two inferior bones that make up

10   the socket.  One is the ischium posteriorly, and one is the

11   pubis anteriorly.

12          Your Honor, may I approach the jury to show them

13   the fins?

14          **THE COURT:**  You may.

15   A    So, this is the acetabular component or the socket of a

16   Birmingham hip resurfacing.  Typically for a left hip it

17   would be placed like this.  And the fins are designed to get

18   additional bony fixation to avoid spinning or rotation.  But

19   in this instance they were placed superiorly.

20   Q    Does that mean up?

21   A    Up towards, towards the patient's head.

22   Q    And in what way, Doctor, should she have been put in?

23   A    They're supposed to be placed in inferiorly.

24   Q    Which means?

25   A    Down towards the feet.

1    **Q**    Doctor, if you would drop down, please, to the

2    additional information section, right in the middle of the

3    page.

4    A    Uh-huh.

5    **Q**    Second line, please.  There's an indication that the hip

6    was so anteverted they need to put the cup in a different

7    position.

8         Doctor, in your review of the medical records, did

9    you determine whether or not Dr. Snyder repositioned the cup

10   from the first surgery to the second surgery?

11   A    Yes, he did.

12   **Q**    And the manner in which he repositioned the cup, did

13   that create concern for this patient?

14   A    It did.  It created an overly anteverted and overly

15   horizontal position of the socket.

16   **Q**    Doctor, under assessment and plan, if you would just go

17   to the third line, please, a suggestion by Dr. Su regarding

18   --

19   A    Yes.  There's a suggestion that his suspicion was that

20   the horizontal cup limits her abduction, AB duction, the

21   ability to take the left leg away from her body.

22   **Q**    And with regard to the continuation of physical therapy?

23   A    Because of that firm block, mechanical block to motion,

24   physical, additional physical therapy would be useless.

25   **Q**    And this again is in May of 2008 per the preceding page

1    54.

2    A    Correct.

3    Q    So we're approximately nine months out from Dr. Snyder's

4    surgery at this time, correct?

5    A    Yes.

6    Q    Okay.  And did Dr. Su make a recommendation as to how

7    there should be any intervention?

8    A    Yes.  His, his recommendation was that likely after

9    getting a CT scan to better assess the cup position that he

10   would suggest a conversion to a total hip replacement.

11   Q    Okay.  And, Doctor, would you just turn the page,

12   please, to page 56.

13          Do you see a reference in the upper left-hand

14   corner as to who may have been copied on this letter?

15   A    Yes, the original surgeon, Dr. Snyder was copied.

16   Q    Okay.  So, could we go back, please, to page 30.  And at

17   page 30, this is the visit of July 8th of 2008 with Dr.

18   Snyder.  Have you reviewed this previously?

19   A    Yes, I have.

20   Q    Okay.  In the third line under follow-up visit, do you

21   see there where Dr. Snyder indicates the presentation of the

22   patient?

23   A    Yes.  He indicated that she remained disappointed with

24   her resurfacing.

25   Q    Okay.  And if you drop down to the third line where it

1    begins she has a difficult situation.

2    A    Yes.   That it was marked with increased anteversion and

3    very little offset.

4    Q    Okay.   Is this suggestive of a concern for this patient?

5    A    Yes.

6    Q    And that is?

7    A    Likely she, she had impingement and it wasn't going to

8    get better.

9    Q    Okay.   Under plan, if you would just take a look at the

10   second line under plan, it begins other than.

11   A    Yes.

12   Q    Do you see Dr. Snyder's plan for continued management of

13   Ms. Rachmil-Etter?

14   A    Yes.   His plan was to have Sheryl continue pelvic

15   stability exercises and physical therapy.

16   Q    And was there any other intervention?

17   A    No other intervention was suggested.

18   Q    Could you please go to page 63 of the jurors' handbook.

19   A    Yes.

20   Q    Now, we're in December of 2008.   And this is an office

21   note from Dr. Bierbaum.   Do you see that?

22   A    Yes.

23   Q    Would you go to, which I'm going to be asking you

24   questions about, go to page 65.

25   A    Yes.

1    **Q**    Which is a second visit with Dr. Bierbaum in March of

2    2009.   Now, you've seen this document before, Doctor?

3    A    Yes, I have.

4    **Q**    Okay.   If you would go into the second paragraph.

5    A    Yes.   Dr. Bierbaum mentions what is striking about her

6    physical examination is the, her limitation of external

7    rotation, her ability to bring the knee out away from her

8    body and the inability to bring the left hip into abduction,

9    which would mean to move the knee away from the midline.

10   **Q**    Does he make a suggestion for intervention here?

11   A    Yes.

12   **Q**    If you would take a look --

13   A    It was his recommendation that she could, she should

14   undergo revision surgery.   And I'm sure he was talking

15   about, although not specifically mentioning it, converting

16   her to a total hip replacement with a ceramic on ceramic

17   articulation.

18   **Q**    Had he made a provisional diagnosis here as to what her

19   condition was?

20   A    He did.   He thought that impingement was the problem.

21   **Q**    If you would just go to page 68, please, for a moment.

22          This is a follow-up visit to Dr. Su.   We're now in

23   February of 2010.

24   A    Yes.

25   **Q**    And have you seen this document before?

1    A    Yes, I have.

2    **Q**    Would you look please at physical examination.

3    A    Yes.

4    **Q**    The third --

5    A    It was mentioned by Dr. Su that she was walking with a

6    very unusual gait that day, that she had extreme intoeing.

7    **Q**    What does intoeing mean, Doctor?

8         **THE WITNESS:**   Your Honor, I wonder if I could

9    demonstrate that for the jury.

10        **THE COURT:**   You can.

11   A    So intoeing is when someone walks with their toe

12   towards, towards the other side.   Most of us walk with our

13   feet out to the side like this.

14   **Q**    Doctor, perhaps you might want to start from over here.

15   A    That's a good idea.

16   **Q**    In front of the jury.

17   A    Most of us walk with our toes out to the side like this.

18   But evidently, Rachel, after her surgery, was walking like

19   this, intoeing on this side, to avoid impingement.   So,

20   this, this is how she was walking, with the leg intoeing.

21   And I think we might see video of that later.

22   **Q**    He goes on to indicate regarding the limited abduction

23   and the limited flexion.

24   A    Correct.   Yeah, her abduction was limited at that time

25   to about 15 degrees and her flexion was limited to about

1    80 degrees.  So these are, both these numbers are decreasing

2    rather than increasing over time with, as additional pain

3    sets in.

4    Q    Does that mean that it's getting worse, Doctor?

5    A    Yes.

6    Q    Would you go, please, to page 59, the second page in

7    this report.  I'm sorry, 69, Doctor.

8    A    Okay.

9    Q    And this paragraph here, the last paragraph, you've had

10   a chance to read this before?

11   A    I have.

12   Q    Okay.  Do you see that Dr. Su focuses on the source of

13   the issues that Ms. Rachmil-Etter is presenting?

14   A    Yes.  He felt that the source of her problem was

15   impingement and that the, the suggestion then would be to

16   convert to a total hip replacement with a, with a better

17   placed socket and a thinner neck to get out of the problem.

18   Q    Doctor, would you go, please, to page 72.  Do you

19   recognize this, sir, as the operative note of Dr. Su's

20   surgery in May of 2010?

21   A    Yes, it is.

22   Q    Okay.  Now, would you turn, please, to page 73, the

23   second page of the doctor's report.

24   A    Yes.

25   Q    Okay.  Do you see under findings?

1   A    Yes.  Well-fixed acetabular and femoral components.

2   Q    Well, just, just stop there, Doctor.

3        What does that mean, well-fixed?

4   A    Sure.  Well-fixed means that the femoral component, the

5   one on the top of the femur, was still well-cemented in

6   place.  There's no way it take that thing off.  That hadn't

7   changed.  And the acetabular component likewise, though

8   malpositioned, was well-fixed to the socket, and it wasn't

9   movable by grabbing it with a device.

10  Q    Did Dr. Su make a finding of a particular condition

11  during this surgery?

12  A    Yes.  He confirmed visually at that time that the

13  patient was suffering from femoral neck impingement on the

14  prosthesis, especially when the hip was extended, in other

15  words, brought, when the knee's brought behind the body

16  slightly as you might do when walking, and also when the

17  leg, when the hip is brought into external rotation when you

18  turn the knee out to the side.

19  Q    Okay.  Doctor, under procedure, would you go down to the

20  third line, please, I'm sorry, third paragraph, the fifth

21  line that begins, "There was quite a bit."

22  A    Yes.

23  Q    Do you see that in there?

24  A    Yes.  The statement is that there's quite a bit of

25  anteversion in the construct, in other words, the cup facing

 1   forward.

 2   **Q**   Go on.

 3   A   With approximate, with probably 60 degrees of combined

 4   anteversion.

 5        Now, this term combined anteversion is not one I

 6   think that the jury has heard yet.  We've heard people talk

 7   about the anteversion of the socket or the acetabular

 8   component which has been estimated at 40 degrees.  Combined

 9   anteversion is when you add in the anteversion of the femur,

10   plus the anteversion of the socket.

11        So, if I could hold this femur up for the, for the

12   jury.  The anteversion involves the, this is the front part

13   of the knee, the distal part of the thigh bone.  The neck

14   sticks up a little bit.  Now, patients who have hip

15   dysplasia tend to have excessive anteversion.  So, she had

16   about 20 degrees of anteversion.  So 20 plus 40 in this

17   instance created a total anteversion or combined anteversion

18   of 60 degrees, which was the source of the intoeing that I

19   demonstrated before.

20   **Q**   Dr. Macaulay, is there any other clinical significance

21   to a finding of 60 degrees of combined anteversion?

22   A   Sure.  Other than the -- other than walking with an

23   intoeing gait, it's suggestive that, that impingement can

24   occur when a normal gait is attempted and that there's pain

25   going on.  In addition, combined anteversion in the setting

1    of a metal-on-metal hip replacement or resurfacing is

2    usually a high wear situation where there's a lot of wear of

3    the metal components.

4    Q   Doctor, if you would continue to the bottom of that

5    page 73, the next to the last line at the bottom, please.

6    The middle of the line, there was about.

7        What -- can you just read that to the jury and

8    again explain to us what that means?

9    A   Sure, I'll read that sentence:  There was a defect of

10   about 2.5 centimeters in the medial wall.

11       So what Dr. Su is referring to here is that once he

12   removed the acetabular component, this metal piece from the

13   socket, it was clear that there was a hole in that, and 2.5

14   centimeters is approximately the size of a quarter.  So,

15   with it out, if I was looking, I could actually look from

16   this side and I could see you from there.  What that, what

17   that means is that the reaming was excessively deep, and

18   this had implications for worsening the impingement.

19       MR. GOROVITZ:  Your Honor, at this time, we would

20   like to run the DVD that we have talked about previously,

21   sir.

22       THE COURT:  It may be done.

23       MR. GOROVITZ:  It runs, it runs about 38 minutes,

24   and I'm just looking at the clock.

25       THE COURT:  So the question is whether to take the

```
 1    recess now or later.

 2              MR. GOROVITZ:  Yes, sir.

 3              THE COURT:  And why don't we take the recess now.

 4              MR. GOROVITZ:  Thank you.

 5              THE COURT:  And we can start with it at eleven

 6    o'clock.

 7              MR. GOROVITZ:  Very good.  Thank you, sir.

 8              THE COURT:  Ladies and gentlemen, you've not heard

 9    all the evidence.  Please, therefore, keep your minds

10    suspended.  Do not discuss the case either among yourselves

11    nor with anyone else.  You may stand in recess for one-half

12    hour until eleven o'clock.  I'll remain on the bench.

13              THE CLERK:  All rise for the jury.

14              (Whereupon the jury left the courtroom.)

15              THE COURT:  Please be seated.

16              I've had occasion to go over the original and the

17    supplementary expert reports.  I've laid my rulings as to

18    what are new in each of the reports.

19              And so we go on, so we can go on smoothly, I'm

20    going to give you these copies now.  Look them over during

21    the break, then return them to the Court because they're the

22    record.  And that way you may conform your questionings to

23    the rulings of the Court.

24              We'll recess then for one-half hour.  We'll recess.

25              THE CLERK:  All rise.
```

1              (Recess.)

2              **THE CLERK:**  All rise for the jury.

3              (Whereupon the jury entered the courtroom.)

4              **THE CLERK:**  Court is back in session, you may be

5    seated.

6              **THE COURT:**  Proceed, Mr. Gorovitz.

7              **MR. GOROVITZ:**  Your Honor, if I could have just one

8    moment at side bar with you, please?

9              **THE COURT:**  You may.

10             **MR. GOROVITZ:**  Thank you.

11   SIDEBAR CONFERENCE, AS FOLLOWS:

12             **MR. GOROVITZ:**  I just -- and I appreciate your

13   Honor reviewing it while I was questioning.  I just wanted

14   to note on the record our objections because in several

15   places where you struck as new was actually an expansion of

16   theory of liability that we already had.

17             **THE COURT:**  So you say.  I don't think so.  Your

18   rights are saved.

19             **MR. GOROVITZ:**  Thank you, sir.

20             (Whereupon the sidebar conference concluded.)

21             **MR. GOROVITZ:**  Your Honor, we would like to show

22   the jury --

23             **THE COURT:**  Wait for the court reporter.

24             **MR. GOROVITZ:**  I'm sorry.

25             **THE COURT:**  Start again, that's all right.

1          **MR. GOROVITZ:**  Thank you.

2          Your Honor, we would like to show the DVD of the

3   surgery by Dr. Edwin Su from May of 2010 at this point.

4          **THE COURT:**  That may be done.

5          Just so no one is surprised, because we've gone

6   over this early, earlier, you're not showing the whole

7   thing, it's a portion of it, isn't that right?

8          **MR. GOROVITZ:**  Yes, sir, the first 39 and-a-half

9   minutes of it only.

10          **THE COURT:**  That's right.  That's fine.

11          **MR. GOROVITZ:**  Okay.  And where indicated

12   appropriate audio versions have been muted.

13          **THE COURT:**  I appreciate that.

14          **MR. GOROVITZ:**  Okay.

15          **THE COURT:**  And that may be played.

16          **MR. GOROVITZ:**  Thank you, sir.

17          (Whereupon the video was played with audio.)

18          **MR. GOROVITZ:**  Your Honor, if I could just stop and

19   ask Dr. Macaulay a question about what he just observed?

20   Would that be okay?

21          **THE COURT:**  Subject to objection you may.

22          **MR. SCHMIDT:**  I guess it depends on the question,

23   your Honor.

24          **THE COURT:**  Precisely.  So, the procedure we can

25   follow, and of course you can object.

1          **MR. GOROVITZ:**  Thank you, sir.

2          **THE COURT:**  Go ahead, Mr. Gorovitz.

3          **MR. GOROVITZ:**  Thank you.

4    BY MR. GOROVITZ

5    **Q**   Dr. Macaulay, you've just seen on the film with comment

6    by Dr. Su regarding the component having been placed very

7    horizontal.

8          Briefly describe what that means in this situation,

9    please?

10         **MR. SCHMIDT:**  Objection.

11         **THE COURT:**  Where's, where's my order?  The

12   objection is based on that.

13         **MR. SCHMIDT:**  Yes, your Honor.

14         **THE COURT:**  All right.  So hand it back to me.  I

15   needed it back after the recess.

16         Actually I'm going to allow that.  And he's using,

17   Dr. Su here is using medical terms.  And when Mr. Gorovitz

18   you a question like that, I'm going to let you explain what

19   he's saying as opposed from giving your opinion as to when

20   that's right, wrong, up, or down.

21         You understand what I'm saying?

22         **THE WITNESS:**  Okay.

23         **THE COURT:**  We, we may get to the second part, but

24   the first part I'm fine with.

25         Put your question again since I interrupted.

1          MR. GOROVITZ:  Yes, sir, thank you.

2          There was comment here that the component had been

3    placed very horizontal, and I'm asking Dr. Macaulay, could

4    you describe that to the jury, please?

5          THE COURT:  Yes, what does that mean when he says

6    that.

7          THE WITNESS:  Sure.  What horizontal means, and we

8    went over this before, I wonder if you recall, but I was

9    holding up this half a pelvis, and horizontal in this

10   instance refers to the fact that the acetabular component

11   was placed more parallel with the ground than is normally

12   the case.  So, the cup had an appearance like this, like it

13   was more facing the ground as opposed to facing out to the

14   side.  So, horizontal refers to the inclination or the

15   abduction angle being too low.

16   Q   And the other comment, please, at the same moment that

17   we stopped was there's a lot of socket protruding above the

18   native bone.

19         Could you briefly describe what that means to the

20   jury, please?

21   A   Yes.  That means -- and that goes hand in hand with what

22   we were just talking about.  If the, if the cup is

23   horizontal then the only way that can happen is that the

24   upper part protrudes out from the bone.  At times that's

25   desirable and at other times it could be too much.

1    **Q**    Thank you.

2              **MR. GOROVITZ:**   If we can continue, please.

3              (Whereupon the video continued to be played with

4    audio.)

5    **Q**    Dr. Macaulay, if I could just stop it there.

6              What does it mean that I feel a hard stop.

7    **A**    What Dr. Su is explaining there is that as the, as the

8    leg, in this instance the thigh bone or the femur bone is

9    brought through a typical range of motion up to 95 degrees

10   of flexion, for example, in this instance, the neck of the

11   femur, of Sheryl's femur was butting up against the

12   acetabular component and that's attributed to by the fact

13   that the cup was horizontal, or flat, as you've heard, and

14   then therefore it would hit in this, in this position.

15             The other important physiologic position for the

16   hip where it was impinging in this instance is when the leg

17   was brought into extension.

18             **MR. SCHMIDT:**   Objection; move to strike.

19             **THE COURT:**   We'll stop him at that point.

20   Sustained.

21             **MR. GOROVITZ:**   And continue, please.

22             **THE COURT:**   Well, continue what?

23             **MR. GOROVITZ:**   I'm sorry, I apologize, with the

24   video, your Honor.

25             **THE COURT:**   Go right ahead.

1              **MR. GOROVITZ:**  I apologize.

2              (Whereupon the video continued to be played with

3      audio.)

4    **Q**   Doctor, what does it mean to be through the medial wall?

5    **A**   So, there's, there is, at the depth of the acetabulum,

6      which is the socket of the ball and socket joint, there's

7      just one layer of bone there, that's the cortical bone.  In

8      this instance during the second surgery that Sheryl had on

9      that day in August of 2007, the second surgery involved

10     reaming deeper to get fixation of that socket.  And then, so

11     part of the cup was actually protruding through a quarter

12     size hole in the center part of the pelvis.

13   **Q**   And does that have implications to someone like Sheryl?

14   **A**   It has implications for bone loss, number one, and

15     number two, the deeper the socket is placed the more

16     prominent the impingement issue is.

17   **Q**   Thank you, Doctor.

18             (Whereupon the video continued to be played with

19     audio.)

20             **THE COURT:**  There's a question.  Stop the tape.

21     And I thank counsel.

22             Actually this is a good question.  So I'll read it

23     to you all:  Why are there spots the plaintiff's lawyers are

24     purposely muting?

25             Because I told them so.  They have nothing to do

1   with the case.  Don't think anything's been hidden from you.

2   Everything that has to do with the case, even though we're

3   not going to see the whole operation, we're not going to see

4   when they closed her up after the total hip.  And I guess

5   we're not going to see the part where they revise the bone,

6   which is I guess part of the total hip, we're not going to

7   see that.  It has nothing to do with this case.  So don't

8   think anything's been hidden from you.  They're doing what I

9   told them to do.

10          All right.  And you can continue playing.

11          (Whereupon the video continued to be played with

12   audio.)

13   Q   Dr. Macaulay, in the sense of offset, could you just

14   describe to the jury what that means?

15   A   Sure.  Sure.  Offset refers to the amount -- I'm going

16   to hold this up as if it is someone's left hip with a

17   resurfacing in place.  Offset is the amount of distance from

18   the middle of the pelvis to where the femur is.  So, offset

19   can be decreased by a variety of different things.  For

20   example, if the acetabular component is placed too medially

21   that can decrease offset.  It can also happen based on the

22   amount of reaming in a resurfacing, how much reaming of the

23   femoral neck happens in this direction.  And typically we

24   try to get the femur back away from the midline to enhance

25   strength and power.

1    **Q**   When it's indicated in the DVD that it's much less than

2    the other side, are they supposed to be similar or within

3    the same --

4         **THE COURT:**   No.  Have i mind my instruction.  Have

5    in mind my instruction.  He may explain technical terms.

6         **MR. GOROVITZ:**   Yes, sir.

7         **THE COURT:**   But that's it.  No evaluative comments,

8    at this stage.

9         **MR. GOROVITZ:**   Okay.

10   **Q**   In discussing the relationship of one side to the other,

11   what is the significance if they are not similar, or they're

12   out of sync?

13   A   Well, it's, it's always desirable to be as symmetric as

14   possible.  In this instance, it's either significant

15   distance between the inferior bones of the pelvis on the

16   right hemi-pelvis which is greater than that compared to the

17   left side.

18        (Whereupon the video continued to be played with

19   audio.)

20   **Q**   Dr. Macaulay, with regard to the groove that was just

21   pointed out in the DVD, what is the clinical significance,

22   please, of that groove?

23   A   The clinical significance of that means that if, if

24   Sheryl can't bring her leg past neutral extension that means

25   it's going to be very difficult to propel herself forward in

1    normal gait.  So, simple walking is going to be difficult

2    because there will be pain within with impingement with

3    every step.

4    Q    So, is the groove indicative of impingement?

5    A    Yes, it's caused directly by it.

6    Q    Thank you, sir.

7         (Whereupon the video continued to be played with

8    audio.)

9         **MR. GOROVITZ:**  Your Honor, that concludes the

10   portion of the DVD we're going to show.

11        **THE COURT:**  Thank you.  Let's turn it off and you

12   can go on with your examination.

13        **MR. GOROVITZ:**  Thank you, sir.

14   Q    Dr. Macaulay, do you have an opinion, sir, to a

15   reasonable degree of medical certainty whether Ms.

16   Rachmil-Etter's left hip was stable at the time that she

17   entered the PACU following the first surgery on August 17th

18   of 2007?

19   A    I do.

20   Q    Sir, what is your opinion?

21   A    My opinion is that the hip was unstable based on the

22   fact that there was an X ray taken an hour after getting

23   there with the hip superiorly dislocated out of the socket

24   to a great degree.

25   Q    Do you have an opinion, sir, to a reasonable degree of

1  medical certainty as to the cause of the dislocation?

2  A   I do.  I feel that the initial placement of the

3  acetabular component during the first surgery on that first

4  day was inadequate to provide stability to the socket and

5  that was evidenced by the postoperative X ray.

6  **Q**   Sir, do you have an opinion to a reasonable degree of

7  medical certainty as to whether or not Ms. Rachmil-Etter

8  should have been converted to a total hip replacement for

9  the second surgery in place of the further modification to

10 the Birmingham?

11 A   I do.  I feel strongly in her situation where the second

12 operation left her with a different problem than instability

13 which ended up being impingement and the cause for prolonged

14 suffering, physical dysfunction, difficulty walking, that

15 the total hip replacement was very appropriate on that first

16 day as the second operation to get her back on track.

17         **THE COURT:**  Well, just, just to be clear.  Do I get

18 your opinion that it was inappropriate to try again with

19 this Birmingham procedure and the appropriate course was to

20 do a total hip?

21         **THE WITNESS:**  Once, once the surgeon had detected

22 the impingement --

23         **THE COURT:**  Always tell the jury.

24         **THE WITNESS:**  Once the surgeon had detected the

25 impingement, which was exactly the same at the end of that

     1   second surgery, as it was on that Dr. Su video you just saw,

     2   the decision should have been made to say, okay, this isn't

     3   working, we're going to have to take out the socket, remove

     4   the femoral head and do a standard total hip replacement

     5   because that impingement problem could be avoided.

     6   Q   The last words, sir, I'm sorry?

     7   A   Because that impingement problem could be avoided with a

     8   total hip.

     9   Q   Okay.  And that was shown, the impingement was shown on

    10   Dr. Su's DVD that we just watched?

    11   A   Right.

    12   Q   And were you able to discern the groove in the femoral

    13   neck?

    14   A   Yes.

    15   Q   Do you have an opinion, sir, to a reasonable degree of

    16   medical certainty as to whether or not Ms. Rachmil-Etter's

    17   impingement of the femoral neck was detectable by Dr. Snyder

    18   at the conclusion of the second surgery?

    19            **MR. SCHMIDT:**  Objection.

    20            **THE COURT:**  No, overruled.

    21   A   I feel that --

    22   Q   I'm sorry, the answer has to be first yes or no.  Yes or

    23   no, if you would?

    24   A   Yes.

    25   Q   Okay.  And your opinion, please?

1    A   Yes, my opinion is that since the component position

2    hadn't changed at all, it was clear from that video that the

3    implants were firmly fixed and hadn't moved, that the

4    impingement situation was there at the time of the closure

5    of the second surgery on that first day.

6    Q   Doctor, I'm coming up to the end of my questions to you.

7        I will ask you to assume that all the questions, or

8    the few questions I'm about to ask you, in which I ask for

9    your opinion, are based on your education, your training and

10   experience, and also your review of the medical records that

11   you told us at the beginning you had seen, as well as the

12   legal materials that you were provided, and also taking into

13   account your testimony here this morning.

14       Do you have an opinion, sir, to a reasonable degree

15   of medical certainty whether Dr. Snyder departed from the

16   acceptable standard of care expected of a physician

17   practicing orthopedic surgery in 2007 when he performed the

18   first Birmingham surgery on Ms. Rachmil-Etter and determined

19   that her left hip was stable at the conclusion of that

20   surgery?

21       Your answer, sir, is either yes you do, or no, you

22   do not have an opinion?

23   A   I do have an opinion.

24   Q   And your opinion, sir, is?

25   A   That there was a deviation from the standard of care

1    based on the dislocation that occurred during transport to

2    the PACU.

3    **Q**   Do you have an opinion, sir, to a relative degree of

4    medical certainty whether Dr. Snyder departed from the

5    accepted standard of medical care expected of an orthopedic

6    surgeon in 2007 when he performed a revision of the

7    Birmingham procedure that involved repositioning of the cup.

8           Your answer, sir, at this point is either yes or

9    no.

10   A    I do.

11   **Q**   And your answer, please?

12   A    The reason I feel that was a deviation from the, from

13   the standard of care is because it wasn't unreasonable to

14   try to move the socket and get stability, but once the

15   impingement problem was seen and future problems from that

16   anticipated then the conversion to the total hip should have

17   happened right there that day.

18   **Q**   Okay.  So, once it was observed that there was a

19   complication the procedure was a total hip; is that correct?

20   A    Right.

21   **Q**   Sir, do you have an opinion to a reasonable degree of

22   medical certainty whether Dr. Snyder departed from the

23   acceptable standard of care expected of an orthopedic

24   surgeon in 2007 when he performed the revision surgery and

25   repositioned the cup?

1    A    I do.

2    **Q**   And your answer, please?

3              **MR. SCHMIDT:**  Objection.

4              **THE COURT:**  Overruled.

5    A    I feel that that was a departure from the accepted

6    standard because the repositioning of the socket ended up

7    obligatorily requiring, requiring deepening of the hole in

8    the pelvis and therefore enhancing the decrease in the

9    offset which ultimately led to the impingement problem.  So,

10   the whole idea that she could have avoided those three years

11   interval of having the limping to that extent could have

12   been avoided.

13             **THE COURT:**  Let me just be clear on your opinion.

14             The patient presented not desiring a total hip.  So

15   if I get your -- and you know that, correct?

16             **THE WITNESS:**  Correct.

17             **THE COURT:**  Okay.  So, your opinion is it was okay

18   to try to reposition the cup after the dislocation, correct.

19             **THE WITNESS:**  Yes.

20             **THE COURT:**  And then you say, you've already been

21   asked, but impingement should have been detected and he

22   should have gone for a total hip.

23             You've said that, correct?

24             **THE WITNESS:**  Yes.

25             **THE COURT:**  I don't mean to put words in your

1    mouth.  I just want to understand.

2              **THE WITNESS:**  I would tell you if were --

3              **THE COURT:**  Fine.

4              **THE WITNESS:**  -- going astray here.

5              **THE COURT:**  Fine.

6         Now he asked you the question about the further

7    excision of bone, and you take issue with that as well.  Is

8    that right?

9              **THE WITNESS:**  That's correct.

10             **THE COURT:**  And so, you say it was okay to try, but

11   when it was revealed to a reasonably competent physician at

12   that time doing this procedure, when it was apparent that

13   you couldn't reposition it and get stability without taking

14   more of the bone he should have gone for a total hip.

15        Is that your opinion.

16             **THE WITNESS:**  Correct.

17             **THE COURT:**  I understand.  All right.  Go ahead.

18             **MR. GOROVITZ:**  Thank you, sir.

19   **Q**   Do you have an opinion, Doctor, to a reasonable degree

20   of medical certainty if Dr. Snyder deviated from the

21   accepted standard of care expected of an orthopedic surgeon

22   in 2007 when he failed to diagnose impingement of this

23   patient's left hip prior to conclusion of the second

24   surgery?

25             Your answer, sir, is yes, you do or no, you do not

```
 1    have an opinion.

 2    A    I do.

 3    Q    And your opinion, sir, is?

 4    A    My opinion is that it's completely expected that the

 5    impingement could have been detected with proper range of

 6    motion testing.

 7    Q    Doctor, do you have an opinion to a reasonable degree of

 8    medical certainty whether that Dr. Snyder's departure from

 9    the accepted standard of care expected of an orthopedic

10    surgeon in 2007 in his care and treatment he rendered to

11    Ms. Rachmil-Etter resulted in any damages to her?

12         Yes or no?

13    A    Yes.

14    Q    Your opinion, sir, is?

15    A    My opinion is that she ended up having significant

16    muscle atrophy and wasting --

17         MR. SCHMIDT:  Objection; move to strike; your

18    Honor.

19         THE COURT:  Yes.  Yes, I'm going to sustain that.

20    I didn't see that in the report.  Sustained.

21    Q    Doctor, are you able to give your answer, please,

22    talking about the injuries that she suffered up to Dr. Su's

23    surgery, please, based on physical appearance?

24         THE COURT:  I'm not sure I understand that

25    question.  Let me try it again.
```

1          Using the same standard, your opinion to a

2    reasonable degree of medical certainty, what do you think

3    the results were after the second surgery up to the total

4    hip performed by Dr. Su?

5          Is that your question?

6          **MR. GOROVITZ:**  Yes, sir.

7          **THE COURT:**  Let's try that.

8          **THE WITNESS:**  My feeling is that based on her

9    inability to extend the leg enough to do simple activities

10   like walking across the floor from one side of the room to

11   the other, put an awful lot of stress on her knee, her hip,

12   her back, and this caused significant suffering along the

13   way and muscle atrophy.

14   **Q**    Did she suffer from an impairment of range of motion?

15   **A**    She did.

16   **Q**    Was that as a result of Dr. Snyder's surgery?

17   **A**    Yes.

18   **Q**    Did she have limitation on her range of motion prior to

19   Dr. Snyder's surgery?

20   **A**    She had some limitation range of motion based on the

21   arthritic process, but she had much better range of motion

22   before the surgery.

23   **Q**    Do you have an opinion, sir, again to a reasonable

24   degree of medical certainty, if Dr. Snyder's departure again

25   from the accepted standard of care expected of an orthopedic

1   surgeon in 2007 was a substantial, was the substantial

2   contributing factor to the outcome of the surgery and the

3   injuries that you just described to the Court?

4            Yes, you do have an opinion?

5   A    I do.

6   Q    And your opinion, sir, is?

7   A    My opinion is that the delay in treatment of almost

8   three years of converting it to a total hip replacement had

9   significant effects on her overall outcome.

10  Q    And does that start from the point of the ability of Dr.

11  Snyder to have detected the impingement at the second

12  surgery?

13  A    Yes.

14  Q    Thank you, sir.  I don't have any further questions.

15  Thank you for your kindness, Doctor.

16           **THE COURT:**  Mr. Snyder?  Excuse me, Mr. Schmidt.

17           **MR. SCHMIDT:**  Thank you, your Honor.

18           **THE COURT:**  I apologize.

19                    **CROSS-EXAMINATION**

20  **BY  MR. SCHMIDT**

21  Q    Good afternoon, Dr. Macaulay.

22           Fair to say, sir, you are licensed only in New York

23  and have never been licensed in Massachusetts; is that

24  right?

25  A    That's correct.

1    Q    And you first became board certified as you testified

2    earlier in about 2001?

3    A    Correct.

4    Q    And are you familiar at all with Dr. Snyder's

5    qualifications and experience?

6    A    I have some recollection of his deposition testimony.

7    Q    Fire to say by August of 2007 he had been in practice

8    about 13 years longer than you?

9    A    Uh-huh.

10   Q    Okay.  Now, about half of your practice then as it is

11   now is devoted to the hip?  About half, right?

12   A    Correct.

13   Q    And a fair amount of that practice sir, is the revision

14   of prior Birmingham hip resurfacings; isn't that right?

15   A    Some of it is.

16   Q    Okay.  About what percentage do you revise other

17   Birmingham hip surfacings that have failed?

18   A    Less than two percent of what I do.

19   Q    Have you ever revised any of your own?

20   A    One.

21   Q    Now, Doctor, you currently practice, or you currently do

22   surgeries about two days a week, right?

23   A    Correct.

24   Q    And on a normal day of surgery you go about ten hours

25   and you pretty much go from one patient, you close that up

1    and you finish it off and then you go right to the next one;

2    is that right?

3    A    Correct.

4    Q    You might actually see the family in between, but then

5    you go right to the next case, correct?

6    A    Correct.

7    Q    And it certainly is not unusual, sir, for a patient of

8    yours to leave the operating room under the care of either a

9    PA, a nurse, or somebody else and taken to the recovery

10   room, correct?

11   A    That's correct.

12   Q    And what you do as good medical practice is give orders

13   to those people who take the patient from the OR to the

14   PACU, to tell them to exercise the appropriate precautions

15   and to be careful with the patient, correct?

16   A    Correct.

17   Q    And to the extent that they, or at the time when they

18   leave your presence, sir, you really can't control much of

19   what happens after that, correct?

20   A    Correct.

21   Q    And when they leave the OR, or at the time they leave

22   the OR they have to be taken off of the OR table and put on

23   some sort of gurney for transport, right?

24   A    They are with an abduction pillow between their legs,

25   correct.

1    Q    Right.   And that's standard of care to do that, correct?

2    A    Yes.

3    Q    And that's the precaution you're talking about, the

4    predominant precaution you take following a surgery like

5    that to make sure that the patient doesn't dislocate,

6    correct?

7    A    Correct.

8    Q    And in addition to that it's also, you don't want to

9    move the patient too much, or you want to be careful moving

10   the patient, correct?

11   A    Correct.

12   Q    And another concern would be perhaps as the patient's

13   coming out of anesthesia that they might have some sort of

14   reaction, get a little agitated, may try to move on their

15   own, correct?

16   A    I haven't seen that very much, no.

17   Q    You've never seen a patient come out of anesthesia with

18   some level of hostility?

19   A    No, that would be unusual.

20   Q    Okay.   Now, when they get into the PACU it is standard

21   of care, is it not, sir, to order a postoperative X ray?

22   A    That is.

23   Q    And the reason why you get a postoperative X ray is to

24   see whether you have a possible complication, correct?

25   A    Correct.

1   **Q**   And one of those possible complications is a

2   dislocation; isn't that right?

3   A   Correct.

4   **Q**   And when you do that postoperative X ray, sir, whoever's

5   doing it you're obviously not there, but there are people

6   there that have to roll the patient over and put a plate

7   underneath them so they can get the X ray and have to roll

8   them back, correct?

9   A   Correct.

10  **Q**   And, sir, if that's done improperly, or if the patient

11  just happens to move they could be put in a position where

12  they could dislocate; isn't that right?

13  A   It shouldn't really happen.

14  **Q**   Sir, could they be put in a position during that process

15  that they could possibly dislocate?  Yes or no?

16  A   Not if the abduction pillow is on.

17  **Q**   And what if, what if for some reason it comes off or the

18  patient moves.  Is it impossible, sir?

19  A   No, it's not impossible.

20  **Q**   Okay.  And if something like that happened certainly

21  outside of -- strike the question.

22          Now, as you've testified, sir, you didn't begin

23  doing the BHR -- you understand what I'm saying, the

24  Birmingham hip resurfacing procedure, BHR?  You didn't start

25  doing that until 2006, correct?

1   A    Correct.

2   Q    And it certainly, at least at that time, was not a

3   perfect procedure, correct?

4   A    Correct.

5   Q    And it has its risks and complications associated with

6   it, correct?

7   A    It does.

8   Q    Now, you did your first Birmingham hip resurfacing

9   procedure on your own as an attending in about June of 2006,

10   correct?

11   A    Correct.

12   Q    Now, as of August of 2007 when you testified in this

13   case -- and, sir, you gave a deposition, like you talked

14   about you read other people's depositions, you gave one of

15   those, too, correct?

16   A    Correct.

17   Q    And you testified under oath and truthfully, correct?

18   A    Yes, I did.

19   Q    And at that time, sir, you testified when talking about

20   your experience that you had done about a hundred of them,

21   correct?

22   A    Correct.

23   Q    And you were trying at that point, sir, to establish the

24   level of experience you had to provide the opinion that you

25   were giving, correct?

1    A   Correct.

2    **Q**   Now, sir, you've talked about, a lot about your writings

3   and publications.  Do you recall writing an article, sir, in

4   March of 2008, or before actually, called:  Total hip

5   resurfacing; a viable alternative to hip arthroplasty in the

6   young active hip patient in the United States.

7    A   Yes, I do.

8    **Q**   And that is -- was that a peer-review article, Doctor?

9    A   Can you remind me which journal that was in?

10   **Q**   It says Special Focus, Current Orthopedic, Current

11  Orthopedics Practice.

12   A   Yes.

13   **Q**   Okay.  So, this is an article that you put out there to

14  your colleagues and for all the world to see to provide your

15  opinion and express your level of expertise, correct?

16   A   Correct.

17   **Q**   And it's very important under those circumstances, sir,

18  for you to be accurate, because you can be, you can

19  certainly be evaluated or scrutinized by your own

20  professional associations if you're not truthful, correct?

21   A   Correct.

22   **Q**   And do you recall, sir, in March of 2008, about two

23  years, or a year after the surgery in 2007, that you said

24  you had only done about 60?

25   A   No, I don't recall that.

1          **MR. SCHMIDT:**  May I approach, your Honor?

2          **THE COURT:**  You may.

3    **Q**    Sir, is that your article?

4    A    Yes, it is.

5    **Q**    And can I refer you to the second page.

6    A    Sure you can.

7    **Q**    Actually the third page under conclusions.  If I direct

8    you right where the star is, I believe.  It says:  I have

9    performed over 60 MOMHR's -- which is the metal-on-metal hip

10   resurfacings -- operations in the past 26 months.

11          And if we take that back to June of 2006 when you

12   started, this is actually a year after, and at that time

13   you're only reporting that you did 60.

14   A    Well, one thing that, as you perfectly pointed out, is

15   that these things are often written well in advance of their

16   publication date.  So I don't know exactly what day I sat

17   down to write that.  But having done, even if it was just 60

18   in that first year, it was a significant experience.

19   **Q**    Okay.  Doctor, but we're talking about your credibility

20   and your level of expertise.  And when it came to this

21   lawsuit you wanted us to believe that you did about a

22   hundred when actuality when you're talking to your

23   colleagues and you knew you would be under scrutiny you said

24   you had only done 60, correct?

25   A    Based on that timing of that writing, yes.

1   **Q**   And this came out a year later.  So we're adding another

2   year beyond 2007 and --

3   A   It's not --

4   **Q**   -- you're still saying you're only doing 60.

5   A   It's not a full year.  You're, you're mixing words

6   there.  It's about nine months, right?

7   **Q**   Okay.  So, it's another nine months.  Did you not do any

8   or did you start subtracting off of the number at nine

9   months from August of 2007?

10   A   No, I did not subtract any off.

11   **Q**   Now, as you've testified, Doctor, this is not the first

12   time you've done this, correct?  You've testified as an

13   expert before?

14   A   Correct.

15   **Q**   And -- strike that.

16         Doctor, I want to talk a little bit about your

17   training.  You said you went over to see Dr. McMinn and Dr.

18   Treacy to train?

19   A   Correct.

20   **Q**   Fair to say that was the gold standard for training on

21   this particular procedure back in 2006?

22   A   Correct.

23   **Q**   Now, are you aware that Dr. Snyder also went to the same

24   training as you did?

25   A   I am now.

1 **Q** You were unaware of that up until this point, correct?

2 A I read his deposition so I was aware of it.

3 **Q** Okay.  And he was also, like you, chosen by Smith &

4 Nephew to provide training to physicians who came from

5 across the country and around the world to teach them how to

6 do the procedure.  Were you aware of that?

7 A No, I was not aware of that.

8 **Q** And you testified that certainly the experience and the

9 training one has relative to this procedure is very

10 important, correct?

11 A It is.

12 **Q** Because that experience and that training is what

13 provides a particular physician with a level of judgment

14 that's either going to be appropriate or inappropriate under

15 certain circumstances, correct?

16 A Correct.

17 **Q** Because these procedures as they're evolving don't

18 always go exactly how you expect them to, correct?

19 A Correct.

20 **Q** And at that times -- and at times like that the surgeon

21 has to make a judgment call basically in the heat of the

22 battle when she's got this patient open and he needs to

23 decide what's in the best interest of his patient, correct?

24 A Correct.

25 **Q** And would you agree with me, sir, that the discussions

1    he has with a patient preoperatively about her particular

2    wishes as to what she wanted and the outcome she wants is an

3    important factor in his judgment call?

4    A    It is an important factor, yes.

5    Q    Okay.  And we know, sir, that even with a failed

6    Birmingham hip resurfacing procedure you can always then

7    convert it to a total like Dr. Su did, eventually?

8    A    Not always, but the vast majority of cases, yes.

9    Q    Well, certainly in the way that Dr. Snyder did in this

10   case it provided an adequate opportunity so he could then

11   try a revision correct?

12   A    Correct.

13   Q    Now, speaking of that video, sir, and you talked about

14   this muscle wasting, you observed the soft tissue during the

15   course of that procedure, correct?

16   A    Yes.

17   Q    And that tissue was in excellent condition, wasn't it?

18   A    It was -- you really can't say that, no.  We saw very

19   small portion of her buttock muscle.  That was like the only

20   muscle that we saw, so.

21   Q    Well, we saw the muscles in and around her joint, sir,

22   correct?

23   A    We saw one muscle.

24   Q    And that would be -- are you saying, sir, that you can't

25   clinically assess an observation whether or not there's

1   muscle wasting or atrophy?

2   A   No, you can't from that video, no.

3   Q   So, your opinion about this muscle wasting and atrophy

4   is certainly not based on anything that you have seen,

5   correct?

6   A   It's based on knowledge of what happens when someone has

7   pain for three years.

8   Q   Well, sir, there are patients, correct me if I'm wrong,

9   there are patients that come to you who need hip resurfacing

10  or hip arthroplasty and they've been immobile or with some

11  sort of atrophy in their hip for years, correct?

12  A   Yes.

13  Q   They could be, literally have frozen hips, correct?  And

14  significant muscle atrophy, correct?

15  A   Yes.

16  Q   And then what you do after you perform that procedure

17  or -- let me take a step back.

18          You wouldn't perform a procedure on a patient like

19  that, sir, unless you thought that they were going to be

20  able to recover that muscle, correct?

21  A   There's a limit to how much they can recover.  But, yes,

22  the idea is that they would get stronger once the pain is

23  gone.

24  Q   So, once you send the patient to therapy you're

25  expecting that that muscle atrophy would be able to recover

1    and they ideally will get some hip motion back, correct?

2    A    To recover some, some percentage of their weakness, yes.

3    Q    And that's, that's in patients who have had decades of

4    muscle atrophy, correct?

5    A    Yes.

6    Q    And so, three years is certainly not an inordinate

7    period of time where there might be some lack of use that

8    would cause such atrophy that you wouldn't be able to

9    recover muscles, correct?

10   A    It's, quite honestly, it's hard to tell whether, you

11   know, how much pain or how much functional disability would

12   cause a permanent loss of function.

13   Q    Fair to say it would be pretty unusual for three years

14   and a patient was walk around with the assistance of a cane

15   and pretty aggressively doing physical therapy that they

16   would lose all function of their muscles, correct?

17   A    No, they shouldn't lose all function, no.

18   Q    Okay.  And there should be actually quite limited

19   atrophy and if any wasting of the muscle, correct?

20   A    No, I wouldn't agree with that.

21   Q    Now, in your experience, sir, you've done a fairly

22   limited amount of Birmingham hip resurfacing procedures on

23   female patients with dysplacia, correct?

24   A    Correct.

25   Q    And, in fact, based on the numbers that I saw in your

1    depositions and what you testified to you've done, about

2    .15 percent of the resurfacings you've done have been on

3    women with dysplacia?

4    A    The deposition specifically discussed the first year.  I

5    had estimated doing about a hundred BHR's over that first

6    year.  Perhaps it was 60.  I estimated about ten percent of

7    those would be females with dysplacia.  So, whether it would

8    be six or ten in that first year that's not just the

9    experience.  The experience has grown since 2007.

10   Q    Well, would you agree with me that it's been a very

11   small percentage of the procedures that you've performed are

12   on women with hip dysplacia?

13   A    It's less than five percent, yes.

14   Q    Okay.  And, in fact, since 2010 it's been even less,

15   correct?

16   A    Yes.

17   Q    Because there has been literature and studies that have

18   come out that have shown that there are a number of factors

19   where these, these procedures are no longer appropriate,

20   correct?

21        **MR. GOROVITZ:**  Objection, your Honor.  Objection,

22   your Honor.

23        **THE COURT:**  Well, I'm going to sustain that.  At

24   issue here is a level of care and knowledge then, and we're

25   going to we're going to stick with that.  Sustained.

1      **MR. SCHMIDT:**  Well --

2   **Q**   But plainly, Doctor, you agree that Ms. Rachmil-Etter

3   was an appropriate candidate for a Birmingham hip

4   resurfacing procedure as of August of 2007, correct?

5   A   Yes.

6   **Q**   Okay.  But, sir, would you agree that although she was a

7   good candidate at the time there is now information

8   available that makes the outcome --

9      **THE COURT:**  I'm going to sustain this.  Come to the

10   side bar.

11   SIDEBAR CONFERENCE, AS FOLLOWS:

12      **THE COURT:**  How can this be relevant?  Now,

13   Mr. Gorovitz has stayed right within my requirements with

14   respect to this supplemental report.  So you won the point

15   about what you were concerned that would take it up to Dr.

16   Su's total hip.

17      Now, since that's her course and since the law is

18   clear that it's the standard of care in 2007, it's only

19   going to confuse things to get into what we now know about

20   Birmingham hips.

21      **MR. SCHMIDT:**  Well, your Honor, it's more of a

22   causation argument.  Because now we know that it's not just

23   the things that he's said caused these things to fail, it's

24   that women have greater failure rate, dysplastic hips have a

25   greater failure rate, small components have a larger failure

1    rate.  So it's an alternative explanation for what actually

2    happened to this woman.  And it's not as to liability, it's

3    actually a caution argument.

4            **THE COURT:**  Let me put it to you this way.

5            I'm going to let you have that.  You go there and

6    we may hear from him how, given this situation and the

7    atrophy, total hip is not a complete repair.

8            You make the choice.

9            **MR. SCHMIDT:**  Thank you, your Honor.

10           (Whereupon the sidebar conference concluded.)

11   **BY  MR. SCHMIDT**

12   **Q**   Sir, were you aware that as of about August of 2007 Dr.

13   Snyder had performed about 130 of these procedures?

14   **A**   I was not aware of that.

15   **Q**   Fair to say that if he had he was considerably more

16   experienced than you?

17   **A**   Possibly.

18   **Q**   And he had the exact same gold standard training,

19   correct?

20   **A**   Correct.

21   **Q**   And you would agree, sir, that two different physicians

22   can look at the identical scenario and come to different

23   conclusions, correct?

24   **A**   Yes.

25   **Q**   And it doesn't necessarily connote a deviation from the

1    standard of care if one physician chooses one path and the

2    other physician chooses another, correct?

3    A    Unless one chooses the wrong path.

4    Q    Doctor, is that true?  My statement true?

5           **MR. GOROVITZ:**  Objection, your Honor.  The

6    witness --

7           **THE COURT:**  Wait a minute.

8           **MR. GOROVITZ:**  I'm sorry.

9           **THE COURT:**  He answered it, but this is a new

10   question.

11   Q    Is that you true, sir?

12          **THE COURT:**  He may answer that.  Overruled.

13   A    I'm going to ask you to rephrase the question because I

14   didn't hear what you --

15   Q    Fair to say that not in of itself the fact that when,

16   that a divergence of opinions on a same issue does not in

17   and of itself constitute a deviation from the standard of

18   care?

19   A    Of course it does not.

20   Q    Okay.  And certainly experience and the judgment of a

21   physician is appropriate in employing when making those

22   types of decisions with a patient, correct?

23   A    Absolutely.

24   Q    And certainly a physician who actually sees a patient

25   and is present at the surgery would certainly be in a better

1   position than you sitting here years after the fact knowing

2   full well what the outcome was in terms of what decision is

3   appropriate and what decision is not?

4   A   Possibly.

5   **Q**   And, Doctor, you before today certainly had never met

6   Ms. Rachmil-Etter in person?

7   A   That is correct.

8   **Q**   And you never examined her?

9   A   That is correct.

10  **Q**   Never even spoke to her?

11  A   That is correct.

12  **Q**   So, you've just relied on what you've read and the

13  depositions and things like that, correct?

14  A   And the medical records and the videos, yes.

15  **Q**   And, in fact, Doctor, in at least one other case in

16  which you've testified there was a record that recorded that

17  the patient's acetabular cup was excessively anteverted and

18  you disagreed with the position who wrote that in the

19  report.

20          Do you recall that?

21  A   I do not recall which case you're talking about.

22  **Q**   Do you remember that issue in a case that you testified

23  in?

24  A   Not at the moment, no.

25  **Q**   Okay.

1    A    Would you like to refresh my memory?

2    Q    The Sutton case?

3    A    Okay.

4    Q    Do you remember that issue in the Sutton case?

5    A    And what does that have to do with this case?

6    Q    I'm simply asking, sir, you disagreed with a record from

7    a treating physician, correct in support of a doctor?

8    A    I have --

9          THE COURT:  I'm not sure I understand that

10   question.

11         MR. SCHMIDT:  I'll --

12         THE COURT:  Put your question.

13         MR. SCHMIDT:  -- withdraw the question, your Honor.

14   Q    Now, sir, you've written some articles that you talked

15   about?

16   A    Yes.

17   Q    And one of the things you've written extensively about

18   is dislocation in the postoperative period for hip

19   arthroplasty, correct?

20   A    Yes.

21   Q    And, sir, do you agree with this statement:  We

22   currently teach residents the incidence of the dreaded

23   complication has decreased to under one percent.

24   Nevertheless, we have evidence from registries and honest

25   physicians contributing to this symposium that the true

1    incidence is higher.

2          Is that right?

3    A    You're referring to total hip replacement now, correct?

4    Q    Well, Doctor, it's after any sort of hip arthroplasty.

5    I understand that it's higher in a total hip replacement.

6    But in general, Doctor, aren't you saying there that the

7    figures that are out there is the actual number for, the

8    percentage of dislocations is actually lower because people

9    are under reporting it?  That's what you found, correct?

10   A    Yes.

11   Q    Okay.  Do you recall writing, sir, that a dislocation is

12   a significant postoperative complication occurring after hip

13   arthroplasty?

14   A    Sounds familiar.  But --

15   Q    Do you agree with that statement?

16   A    -- if you would like to refresh my memory as to when.

17   Q    Well, do you agree with that statement?

18   A    I do.

19   Q    Okay.  You've also written some about, about malpractice

20   and orthopedic surgeons being sued?

21   A    Yes.

22   Q    Done some of your own research, correct?

23   A    Collaborate with other researchers.

24   Q    And some of the purposes of that research is to

25   understand the trends so that you can give other orthopedic

1   surgeons tips as to how to avoid getting sued?

2   A   No, no, I wouldn't say that that's the main reason.

3   Q   Would you agree with this statement, sir:   An

4   understanding of the trends and associations in medical

5   malpractice claims could help decrease the incidence of

6   lawsuits when surgeons and patients are faced with a poor

7   outcome.

8         Do you agree with that statement?

9   A   Uh-huh.

10  Q   Okay.  Do you recall that as part of the research you

11  did a questionnaire was sent out under the American

12  Association of Hip and Knee Surgeons, there was a

13  questionnaire about medical malpractice?

14  A   Yes.

15  Q   One of the questions in there, sir, was do orthopedic

16  surgeons who are willing to testify as experts contribute to

17  an increase in medical malpractice litigation.

18        Do you remember that question?

19  A   Yes.

20  Q   That's part of your analysis and your study and part of

21  your contributions to the medical research?

22  A   Uh-huh.

23        THE COURT:  Well, wait a minute.  I mean, this

24  comment is appropriate.  I'm not so sure that's medical

25  research, but then that may not be my business.  What I am

1  sure of is that it is perfectly appropriate for any

2  qualified witness to come into court and to testify

3  honestly.  No, no conclusions can be drawn against this

4  witness because as a physician he's testifying in this type

5  of case.  That's not the way the law works.

6       Now, you'll determine what the -- there are factual

7  differences here.  Important factual differences.  You're

8  going to have to resolve those.  But don't hold anything

9  against this witness because he is testifying in a case.

10 That's not proper.

11      Go ahead.

12      **MR. SCHMIDT:**  Thank you, your Honor.

13 **Q**   Now, you spoke a little bit on direct examination about

14 the dysplacia and the dysplacia cup.  Sir, you would agree

15 with me that it was not the standard of care in August of

16 2007 to use an acetabular cup on a patient with dysplacia?

17 **A**   I would say that the knowledge was such at that time and

18 the training was such that the dysplacia cup was a known

19 option which could have been deployed in this case.

20 **Q**   Absolutely, Doctor, and I don't disagree.  Because --

21      **THE COURT:**  Well, whether you disagree is not

22 important.  But you put questions.

23 **Q**   Doctor, you cited that publication from Smith & Nephew

24 as the source of that.  It's fair to say that that is a

25 marketing publication, correct?

1    A    No.

2    Q    That is not a --

3    A    It's not, it's not for marketing.  It's for, it's for --

4    it's a teaching tool that the design surgeons created so

5    that people do it right.

6    Q    And all it says in there about the acetabular cup, it

7    says merely an option for use at the surgeon's discretion.

8              MR. GOROVITZ:  Objection, your Honor, just, if that

9    question could be rephrased.  I think he said acetabular.

10   Did you mean to say dysplacia cup?

11             MR. SCHMIDT:  Dysplacia cup.  I stand corrected.

12             THE COURT:  Thank you, Mr. Gorovitz.  He'll correct

13   the question.

14             MR. SCHMIDT:  I stand corrected.  I apologize if

15   that question was confusing.

16   Q    It's fair to say that all that's in that publication is

17   that the use of a dysplacia cup is merely an option to be

18   used at the discretion of the surgeon?

19   A    Correct.

20   Q    Okay.  And are you familiar -- strike the question.

21             Now, you would agree, Dr. Macaulay, that the

22   plaintiff had significant pain before she underwent the

23   surgery with Dr. Snyder?

24   A    Yes.

25   Q    And she also had limitations due to her activities

1   because of pain?

2   A    Yes.

3   Q    And that was the result of the dysplacia she had and the

4   osteoarthritis that had developed?

5   A    Correct.

6   Q    And, Doctor, if that had not been treated it would have

7   gotten progressively worse over time, correct?

8   A    Yes.

9   Q    And the limitations would have been increased?

10  A    Yes.

11  Q    Including a decrease in the range of motion?

12  A    Probably.

13  Q    And, Doctor, can I refer you to page 8 of the jury book.

14  And about halfway down the page, sort of toward the left

15  hand side there's a sentence that starts with she.  Dr.

16  Bierbaum reports that she has extreme limitation of external

17  rotation, zero on the left, 40 on the right, compared with

18  80 of internal on the right and 70 on the left.

19          Doctor, it's fair to say that at the time in August

20  of 2004 she had a significant impairment in her external

21  rotation, correct?

22  A    Correct.

23  Q    That was well before the surgery with Dr. Snyder,

24  correct?

25  A    Correct.

1    **Q**   And that would have been expected to get worse over time

2    if not treated, correct?

3    A   Correct.

4    **Q**   Now, I would like you to go to page 14 of the jury book.

5    Under physical exam.  This is Dr. Snyder's preoperative

6    assessment, his first visit with her, under physical exam

7    the second line down in the far right.  He records:  Her

8    range of motion is markedly limited in her left, but she

9    gets to 60 degrees of forward flexion before she falls into

10   20 degrees of external rotation, and she cannot get back to

11   ten degrees short of internal rotation.

12        You would agree with me, sir, that that's a

13   considerably worsening limited range of motion from the time

14   that Dr. Bierbaum saw her in August of 2004 to the time that

15   Dr. Snyder saw her in 2007, correct?

16   A   Yes.

17   **Q**   And we know from the surgery we just saw and some of the

18   other notes that she was getting at least upwards of 95

19   after Dr. Snyder's surgery, correct?

20   A   Correct.

21   **Q**   So, that was a considerable improvement in that range of

22   motion, correct?

23   A   Correct.

24   **Q**   And one of the things that was recorded on the video was

25   that she didn't have any external rotation before Dr. Su's

1    surgery, correct?

2    A    Correct.

3    **Q**    Is that your understanding, that she was unable to

4    externally rotate her leg?

5    A    Yes.

6    **Q**    I would like to refer you to page 65 of the jury book.

7    Now, I'll represent to you that that's Dr. Bierbaum's note

8    of March of 2009, almost two years after her surgery.  And

9    it says:  In extension, she cannot abduct from zero degrees

10    and she cannot externally rotate beyond neutral.

11           Sir, what he's saying there is that when her leg is

12    completely locked she can't, she can't move it out and she

13    can't turn it, correct?

14    A    When her, hen her leg is straight, correct.

15    **Q**    Okay.  Doctor, it's fair to say that there aren't any

16    activities or like exercise where you would need your leg in

17    fully extended fashion and have to rotate it and move it any

18    way.  Is that fair to say?

19    A    Well, it's an important part of the exam.  So I wouldn't

20    say that's true.

21    **Q**    That's not my question, sir.  My question you don't need

22    that to be physically functional, correct?

23    A    Correct.

24    **Q**    Okay.  Now, can you go to the next sentence there.  It

25    says:  In flexion, she can internally and externally rotate

1    in a normal manner.

2            What that means, sir, if I'm reading that

3    correctly, as soon as she bends her knee a little bit she

4    can do all those things with her leg, correct?  In a normal

5    fashion, correct?

6    A    That's the suggestion.

7    Q    Well, that's what Dr. Bierbaum wrote when he examined

8    her; isn't that right?

9    A    That's what he wrote.

10   Q    There's no suggestion there, that's his finding,

11   correct?

12   A    Correct.

13   Q    Are you questioning that, sir?

14   A    I'm questioning the level of flexion.  I don't know --

15   it's very vague.  I'm not sure how much flexion she needed

16   to do to achieve that.

17   Q    Well, when he says she put it in flexion and she had

18   normal external rotation, that's, that's a pretty functional

19   leg, isn't it?

20   A    Sounds like it could be functional, yes.

21   Q    Fair to say, sir, that someone with that level of

22   function could ride a bike?

23   A    Possible.

24   Q    They could certainly walk without abnormality, correct?

25   A    Possible?

1    **Q**    They could certainly use an elliptical machine?

2    A    Well, he's not really talking about extension here.  So,

3    rotation's not the only thing required for normal walking or

4    an elliptical trainer.

5    **Q**    What about swimming a mile a day?  Could somebody do

6    that with that level of function?

7    A    It's very hard to swim when you can't extend your leg.

8    **Q**    Well, Doctor, are you aware that as of August of 2008

9    Mrs. Rachmil-Etter reported to her primary care physician,

10   Dr. Schoenfeld, that she was swimming a mile a day?  Does

11   that surprise you.

12   A    It doesn't surprise me.

13   **Q**    So which is it, can you do it or can you not do it?

14   A    It depends which stroke you're using.  If you're doing,

15   if you're using a breast stroke it's possible.  If you're

16   using a flutter kick, I would doubt she could do it.

17   **Q**    Okay.  Well, the fact that she was swimming a mile a day

18   and we don't have any evidence of -- I'll withdraw that

19   question.

20          It's fair to say that based on Dr. Bierbaum's

21   reported examination she should have been able to do all

22   those things?

23   A    All what things?

24   **Q**    Biking, elliptical, walking, and swimming.

25   A    No.

1    **Q**    I'm sorry, which one couldn't she do again?

2    A    I don't think she could walk normally.

3    **Q**    Well, Doctor, we just watched the video.  Fair to say --

4    strike that.

5          When you were describing what was going on with

6    her, you said that intoeing was a result of Dr. Snyder's

7    surgery, that's what you testified to, correct?

8    A    Part of the degree of the internal rotation is due to

9    that, yes.

10   **Q**    Well, sir, her right leg was intoeing quite

11   significantly as well, correct?

12   A    Correct.

13   **Q**    And you know that she had that since birth, correct?

14   A    Yes.

15   **Q**    Okay.  So, not all of what we just saw had anything to

16   do with Dr. Snyder's surgery, it was what her condition was

17   at baseline, correct?

18   A    Not all of it, correct.

19   **Q**    Doctor, in your disclosure you were talking about the

20   fact that she dislocated represented a deviation in the

21   standard of care.  But you gave it two options.  You said

22   either he didn't trial properly, or there wasn't proper

23   precautions.  Isn't that what you said?

24   A    Or both.

25   **Q**    Well, you said or, and you said in the alternative in

1   your disclosure, correct?

2   A   I did.

3   **Q**   Okay.  So you don't know whether it was that he didn't

4   trial properly or whether something happened on the way to

5   the PACU?

6   A   Well, I know based on what happened that stability

7   testing wasn't done.

8   **Q**   Well, Doctor --

9   A   Because when he was in there four later hours later he

10  described the same hip as being grossly unstable.  So,

11  nothing happened other than dislocation that would have

12  changed that.

13  **Q**   Well, Doctor -- one minute.  Can I refer you to page 41

14  of the jury book.

15  A   Yes.

16  **Q**   Doctor, on about five lines up starting in the middle of

17  the page, Dr. Snyder writes:  The patient then had a

18  reduction and was stable throughout.

19       I'll represent to you that he's testified that when

20  he writes that in his operative notes that means he reduced

21  the dislocation, put it back in place, and ran her through a

22  set of trialing and she was, and he writes is stable

23  throughout.

24       Do you accept that testimony as Dr. Snyder doing

25  trialing?

1    A    I don't -- I can't tell by reading this alone that

2    stable, what stable throughout means.  So, I don't know.

3    Q    Well, it's a pretty generally accepted term, isn't it,

4    in the orthopedic surgery community?

5    A    I don't believe so, no.

6    Q    So, stable to one person means something different to

7    another.

8    A    No, throughout to one person means -- throughout, it

9    means a different thing to a different person.  Stable

10   throughout what?

11   Q    If he meant stable through the trialing process.

12   A    Okay, then --

13   Q    That's what he's supposed to do, correct, go through the

14   trialing process --

15   A    Supposed to do it --

16   Q    -- and assess that it's stable.

17   A    -- and assess it and make sure it's stable, yes.

18   Q    Okay.  Well, if you go through the trialing and it

19   appears stable that's about all you can do, correct?

20   A    He could be a little bit more specific.

21   Q    So it's a matter of how he documented as opposed to what

22   he did?

23   A    No, it's a matter of both.

24   Q    Doctor, based on your prior testimony, I understand that

25   you've never had a dislocation postoperatively, correct?

1    A    In the Birmingham hip resurfacing, correct.

2    Q    Okay.  In other, in other procedures you have?

3    A    I have seen total hip replacements dislocated in the

4    operating, in the recovery room.

5    Q    Okay.  So it happens?

6    A    It does.

7    Q    And, Doctor, at least as to this particular situation,

8    you would agree with me that you have absolutely no

9    experience in determining how to deal with this dislocation,

10   this surgical emergency in the postoperative period,

11   correct?  Never done it before?

12   A    There are years of experience and reading and discussion

13   amongst colleagues that would help me make that

14   determination.

15   Q    But, Doctor, certainly your own personal experience

16   would give you the level of expertise in the formulation of

17   proper judgment under those circumstances, correct?  It's

18   not about just reading a book, it's out there doing it,

19   correct?

20   A    That's part of it.  Experience is an important part of

21   it, yes.

22   Q    And that means something in the orthopedic surgery

23   field, does it not?

24   A    It does.

25   Q    And that's why people tout their experience because the

1    more you have, the likely the better you are, correct?

2    A    It's likely, yes.

3    Q    And that's why you said it was a hundred procedures as

4    opposed to 60 when you wrote if in your paper, correct?

5    A    (No audible response.)

6    Q    Now, you have no issue, sir, with the consent or

7    anything that was done for the second surgery, correct?

8    A    I have no issues with the consent process, no.

9    Q    Okay.  And you agree, sir, that it was reasonable for

10   Dr. Snyder to go back in and try to do that revision,

11   correct?

12   A    Yes.

13   Q    Okay.  *What it is is you just disagree ultimately with*

14   *the outcome, correct?*

15   A    And leaving the operating room with a hip that impinged,

16   yes.

17   Q    Okay.  And it's fair to say that in formulating that

18   opinion you certainly knew the outcome and Dr. Snyder did

19   not, correct?

20   A    Correct.

21   Q    Now, in terms of the cup position, Doctor, when you're

22   in that situation, you'd agree with me that a patient's

23   anatomy is an important factor in determining where that cup

24   goes, correct?

25   A    It is.

1   **Q**   And one of the reasons why you might actually graft, or

2   ream a little bit deeper into the pelvis is to get good bony

3   coverage, correct?

4   A   Correct.

5   **Q**   And good bony coverage oftentimes can equate to

6   increased stability, correct?

7   A   Good bony coverage of the acetabular component makes it

8   less likely to move later on, yes.

9   **Q**   Okay.  And you were talking about, that you thought he

10  did the fins wrong, but we know that that didn't have any

11  part in this, played any part in this case because it was

12  actually affixed excellently when Dr. Snyder did the

13  surgery, correct?

14  A   It was very well-fixed, correct.

15  **Q**   Now, in Dr. Su's note he commented that initially before

16  he actually made a formal diagnosis of impingement that he

17  suspected on examination that the cup was not in a perfect

18  position.

19          Do you recall reading that?

20  A   Yes.

21  **Q**   And, Doctor, certainly perfection is not what the

22  objective is, correct?

23  A   It's always the objective.

24  **Q**   Well, it's --

25  A   It's not the expected outcome.

1   **Q**   That's probably a bad question.

2          It's not what the standard is and it's not what the

3   physician is held against, correct?

4   A   Correct.

5   **Q**   Okay.  And it's fair to say that although physicians --

6   and you said a number of words, you say we strive for, we

7   try to, we make attempts to.  It's fair to say that when

8   you're in the operation itself making the determination as

9   to where that cup goes is a judgment call, correct?

10  A   Yes.

11  **Q**   And there's no actual protractor or anything that you're

12  using, you just basically size it up, eyeball, and say that

13  looks about right.  Correct?

14  A   There are devices available for that.  But yes.  It's

15  not necessarily the standard of care to use them.

16  **Q**   All right.  And experienced surgeons when they're

17  putting them there they're focusing on where can I get good

18  bony coverage, correct?

19  A   Yes.

20  **Q**   Where can I get this patient where the hip is stable,

21  correct?

22  A   Correct.

23  **Q**   And that may come into play with the patient's anatomy,

24  where that, what their limitations are in that regard,

25  correct?

1    A    Correct.

2    Q    And finally, it's trying to get them to a functional

3    range of motion, correct?

4    A    Correct.

5    Q    And would you agree with me that before leaving the

6    operating room you certainly want to make sure that it's

7    stable, correct?

8    A    Correct.

9    Q    And if you put a patient through a range of motion and

10   it's not perfect but it looks like they're going to get to

11   an appropriate range of motion that would be acceptable,

12   correct?

13   A    Could you rephrase the question?

14   Q    Well, you don't need to, you don't need to get a patient

15   to 140 degrees or anything else, you need to get them to

16   where you think based on them lying on the table

17   anesthetized they're going to use their leg and they're

18   going to be able to do the things that they want to do like

19   run, bike, walk, use the elliptical, and swim.

20   A    Let's just be clear, yes, there are, there are ways of

21   assessing that with about a hundred percent certainty that

22   someone will not impinge during normal activities of daily

23   living, and I don't think that happened in this case.

24   Q    Doctor, would you agree that the literature has shown

25   that the acetabular cup is only put in, or the optimal

1  ranges of version and inclination about 47 percent of the

2  time?

3  A   That's correct.

4  Q   So, more people than not don't put it within those

5  parameters that you were talking about, correct?

6  A   Correct.

7  Q   And is it your opinion, sir, that all of those surgeons

8  make mistakes, or have made a mistake in doing that?

9  A   Yes.

10  Q   Speaking of that, Doctor, you testified that you don't

11  think that there are any experts in this field in

12  Massachusetts, correct?

13  A   I was asked during my deposition to give examples of

14  experts in Birmingham hip resurfacing.

15  Q   And you said there were none in Massachusetts, correct.

16  A   That was my opinion.

17  Q   And there were none in New England?

18  A   That was, that was what I said, yes.

19  Q   Is it just New York that we get these experts, Doctor?

20  A   No, I'm sure there's some in LA, too.

21  Q   Okay.  So it's just New York and LA?

22  A   No.

23  Q   Nobody else?

24  A   Boston has fine surgeons.

25  Q   Okay.  Doctor, you testified that you, you charge about

1    800, about $500 an hour?

2    A    Correct.  For review of records, yes.

3    Q    Have you ever charged $800 an hour, sir?

4    A    I'm sure I have for certain things.

5    Q    And there are cases out there that you've charged well

6    over $10,000 for your opinions, correct?

7    A    Just three cases in ten years.  Correct.

8    Q    Okay.  And it's $8,000 for you to come here today, in

9    addition to your travel expenses and the like, sir, right?

10   A    Correct.

11   Q    Sir, now, your opinions regarding, that you've given

12   today about the angles of placement and the like, sir, do

13   you recall espousing a position in another case that there

14   were no absolute angles or placement in 2007 for hip

15   arthroplasty?

16   A    No, I don't remember ever saying that.

17   Q    Well, Doctor, did you espouse that theory that that was

18   the standard as of 2007?

19   A    No.

20   Q    Sir, you're familiar with the Smith case?

21   A    Yes.

22   Q    Okay.

23          MR. SCHMIDT:  May I approach, your Honor?

24          THE COURT:  You may.  It's about one o'clock.

25          MR. SCHMIDT:  I'll -- I've skipped a lot, your

1    Honor, and I'm going to finish with this.

2            **THE COURT:**  Well, we're going to stop at one

3    o'clock, and that's about another minute.  Go ahead.

4            **MR. GOROVITZ:**  Your Honor, I apologize, the

5    gentleman needs to return to New York for surgery tomorrow.

6            **THE COURT:**  You see these jurors here?

7            **MR. GOROVITZ:**  Yes, sir.

8            **THE COURT:**  You know what the Court's rules are.

9            **MR. GOROVITZ:**  I understand, sir.

10           **THE COURT:**  We're not crowding anyone.  Go ahead.

11   **BY  MR. SCHMIDT**

12   **Q**   Sir, was the theory that you espoused in that case that

13   there were no absolute angles of placement in 2007 for total

14   hip arthroplasty?

15   **A**   You're reading from Dr. Michael Mont's opinion.  This is

16   not my deposition.

17   **Q**   It's not, Doctor.  But is that the opinion you were

18   espoused, you held in that Smith case?

19   **A**    No, it's not.  I think there are very important angles

20   that we need to adhere to.

21           **THE COURT:**  All right, that's his testimony.  Is

22   that it for this witness?

23           **MR. SCHMIDT:**  No, your Honor.

24   **Q**   Do you recall --

25           **THE COURT:**  Well, then we'll be back here tomorrow

1    morning at nine o'clock.  I made a commitment to these

2    jurors and I keep it.

3              All right.  Keep your minds suspended.  You've not

4    heard all the testimony.  Do not discuss the matter either

5    among yourselves nor with anyone else.

6              We'll stand in recess until 9:00 a.m. tomorrow

7    morning.  We'll recess.

8              **THE CLERK:**  All rise for the jury.

9              (Whereupon the jury left the courtroom.)

10             **THE COURT:**  Please be seated.  You may step down,

11   sir.

12             (Whereupon the witness stepped down.)

13             **THE COURT:**  The total elapsed time of three days

14   for each side stands, plaintiff, one day, three hours, ten

15   minutes; defense, three hours and 50 minutes.

16             We can take this witness out or order if you want

17   to work it out, he can return.  Otherwise, or, in any event,

18   I guess is the way to say it, in any event, we're starting

19   nine o'clock tomorrow morning.

20             We'll recess.

21             (Adjournment.)

22

23

24

25

1              **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5     the United States District Court for the District of

6     Massachusetts, do hereby certify that the foregoing pages

7     are a true and accurate transcription of my shorthand notes

8     taken in the aforementioned matter to the best of my skill

9     and ability.

10

11

12

13

14          /S/ DONALD E. WOMACK 6-24-2013
           _____
15              DONALD E. WOMACK
             Official Court Reporter
                 P.O. Box 51062
16        Boston, Massachusetts 02205-1062
              womack@megatran.com

17

18

19

20

21

22

23

24

25